FILED
United States Court of Appeals
Tenth Circuit

December 4, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHERILYN KELLOGG, now known
as Cherilyn Worsley,

      Plaintiff-Appellant,

v.

METROPOLITAN LIFE INSURANCE
CO.; PFIZER ACCIDENTAL DEATH
AND DISMEMBERMENT
INSURANCE PLAN,

      Defendants-Appellees.

No. 07-4213

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:06-CV-610-DAK)**

---

Brian S. King (James L. Harris, Jr. with him on the briefs), Salt Lake City, Utah,
for Plaintiff-Appellant.

Jack M. Englert, Jr. (James L. Barnett, Holland & Hart LLP, Salt Lake City, Utah,
with him on the brief), of Holland & Hart LLP, Greenwood Village, Colorado, for
Defendants-Appellees.

---

Before **BRISCOE, SEYMOUR,** and **PORFILIO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiff Cherilyn Kellogg brought this action against defendants Metropolitan Life Insurance Company and Pfizer Accidental Death and Dismemberment Insurance Plan, claiming she was wrongly denied accidental death and dismemberment benefits under an employee welfare benefit plan regulated by the Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. §§ 1001-1461. Cherilyn Kellogg's deceased husband, Brad Kellogg, was a participant in the plan at issue. On the parties' cross-motions for summary judgment, the district court granted judgment in favor of the defendants. Kellogg now appeals the district court's decision. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment in favor of defendants and remand with directions to enter summary judgment in favor of Kellogg. We also direct the district court, on remand, to consider Kellogg's requests for fees and prejudgment interest.

I.

*Brad Kellogg's fatal accident*

On September 6, 2004, Brad Kellogg was driving a 1993 Dodge Caravan eastbound on East Alexander Avenue in Merced, California. He purportedly stopped at a stop sign at the intersection of East Alexander Avenue and Parsons Avenue, and then continued eastbound on East Alexander Avenue. As he proceeded eastbound, his minivan veered into the westbound lane, and then into a tree on the north side of East Alexander Avenue. A female resident who observed

2

the crash called 911.  Law enforcement and fire officials responded to the scene and found Brad Kellogg "hunched over in the driver's seat" of the minivan, "incoherent and bleeding from his face."  App. at 170.  After being extracted from his vehicle, Brad Kellogg was transported to a local hospital, where he died.

The woman who observed the crash and called 911 was questioned by a law enforcement officer and stated

> that she had seen the vehicle with the subject in it make the stop eastbound on E. Alexander at Parsons.  [She] said that once the vehicle had taken off from the stop sign at Parsons, that she noticed that the driver appeared to be having a seizure.  [She] said that the vehicle then veered into the tree on the northside of E. Alexander.  [She] said that she noticed the subject did not even step on his brakes, as she did not see the brake lights, nor did she hear a skid.

Id.

On September 10, 2004, the Merced County (California) Sheriff's Department received a toxicology report that indicated that Brad Kellogg, at the time of his death, had detectable levels of five prescription and/or over-the-counter drugs in his system: acetaminophen (2.2mg/L), buproprion (2.29 mg/L), hydrocodone (0.23 mg/L), propoxyphene (0.08 mg/L), and norpropoxyphene (0.12mg/L).

On September 13, 2004, an autopsy report was prepared by a private pathologist for the Merced County Sheriff's Department Coroner's Division.  The report's "CASE SUMMARY" section read as follows:

The cause of death in this case is considered to be extensive

3

subarachnoid hemorrhage of the brain secondary to traumatic transverse basilar skull fracture. Post mortem toxicology studies revealed effective levels of acetaminophen, hydrocodone, propoxyphene, and Norpropoxyphene. Levels of Bupropion far exceed therapeutic levels in this patient. Idiosyncratic reactions of this drug include: numerous neuropsychiatric phenomenon including psychoses, confusion, delusion, hallucinations, psychotic episodes, and paranoia. Whether excessive levels of this drug contributed to this subject's accidental and [sic] death is unknown.

Id. at 190.

On January 20, 2005, the Deputy Coroner for Merced County signed a "Physician/Coroner's Amendment." Id. at 85. That document indicated that Brad Kellogg suffered a "SUBARACHNOID HEMORRHAGE" and a "BASILAR SKULL FRACTURE" from a "SOLO MOTOR VEHICLE ACCIDENT." Id. The document further stated as follows:

THE DECEDENT WAS THE SAFETY BELT RESTRAINED DRIVER AND SOLE OCCUPANT OF A DODGE CARAVAN THAT HE WAS DRIVING EASTBOUND ON ALEXANDER AVENUE. THE DECEDENT COMPLETED A STOP AT THE POSTED STOP SIGN AT THE INTERSECTION OF PARSONS AVENUE. HE THEN AGAIN PROCEEDED EASTBOUND AND AT THAT POINT, ACCORDING TO A WITNESS HE APPEARED TO HAVE A SEIZURE, LOST CONTROL OF THE VEHICLE AND RAN HEADON [sic] INTO A TREE LOCATED NEXT TO THE CURB OF THE WESTBOUND LANE OF ALEXANDER. THE DECEDENT HAD A POST MORTEM BLOOD BUPROPION LEVEL OF 2.29 MG/L. THIS DRUG HAS A REPORTED RISK FACTOR OF SEIZURES.

Id.

4

*Brad Kellogg's coverage under the Plan*

At the time of his death, Brad Kellogg was employed by Pfizer Incorporated (Pfizer) as a pharmaceutical sales representative and was a participant in the Pfizer Life Insurance and Accidental Death and Dismemberment (AD&D) Insurance Plans (the Plan), which was an ERISA-regulated employee welfare benefit plan. The Plan automatically provided each participant life insurance coverage equal to two times their annual pay. The Plan further allowed each participant the opportunity to elect additional life insurance coverage and one of ten AD&D insurance coverage options. Brad Kellogg elected to pay for additional life insurance and AD&D coverage in amounts equal to "six times [his] annual pay," or approximately $438,000.00 each. Id. at 63.

The AD&D provisions of the Certificate of Insurance provided, in pertinent part, as follows:

> If You sustain an accidental injury that is the Direct and Sole Cause of a Covered Loss described in the Schedule of Benefits, Proof of the accidental injury and Covered Loss must be sent to Us. When We receive such Proof We will review the claim and, if We approve it, will pay the insurance in effect on the date of the injury.
>
> Direct and Sole Cause means that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes.
>
> * * *
>
> EXCLUSIONS
>
> We will not pay benefits under this section for any loss caused or

contributed to by:

1. physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity . . . .

Id. at 293.

The AD&D provisions of the Summary Plan Description (SPD) stated in similar, but not identical, fashion, that "[i]f you [the participant] die as a result of, and within 12 months after, an accident, your beneficiary will receive 100 percent of your AD&D insurance coverage." Id. at 68. The SPD also stated that "losses due to . . . physical or mental illness" were excluded from AD&D coverage. Id. at 69.

*Cherilyn Kellogg's claim for life and AD&D benefits*

On February 9, 2005, Kellogg's attorney submitted to Metropolitan Life Insurance Company (MetLife), the claims administrator, a formal claim for life and AD&D benefits under the Plan. On March 8, 2005, MetLife sent a letter to Kellogg's attorney stating that, "[i]n order for [it] to consider the claim for [AD&D] insurance benefits," it "require[d]" a "Copy of the Police Report," a "Copy of the Autopsy Report," a "Copy of the Toxicology Report," and "Newspaper clippings." Id. at 116.

On March 25, 2005, MetLife sent a letter to Stephen Morris, a deputy coroner with the Merced County Sheriff's Department, asking for "[a] written statement by the medical examiner/coroner on their letterhead stating the manner

6

of [Brad Kellogg's] death." Id. at 113. On March 30, 2005, Morris sent a letter

back to MetLife, on Sheriff's Department letterhead, stating as follows:

> Brad Kellogg (DOB 07/12/1968), expired on 09/06/2004 at Mercy
> Medical Center, Community Campus in the city of Merced in Merced
> County California.
>
> Mr. Kellogg's death is not the result of a homicide or suicide. He
> died as the result of traumatic injuries sustained in a solo motor
> vehicle accident. His death is considered to be accidental.

Id. at 109.

On May 10, 2005, MetLife approved Kellogg's claim for life insurance

benefits under the Plan. On that same date, MetLife sent a letter to Kellogg's

attorney addressing the issue of AD&D benefits and stating, in pertinent part:

> In order for us to consider the claim for Accidental Death and
> Dismemberment Accidental insurance benefits, we will require the
> following:
> • Copy of the Police Report
> • Copy of the Autopsy Report
> • Copy of the Toxicology Report/Toxicology Report
> • Newspaper clippings (if available)

Id. at 87.

On June 9, 2005, Kellogg's counsel forwarded to MetLife "(i) the final

Certificate of Death; (ii) a copy of the police report; (iii) a copy of the autopsy

report; (iv) a copy of the toxicology report; and (v) the newspaper clippings that

were in Mrs. Kellogg's possession." Id. at 166. Along with the documents,

counsel sent a one-page letter to MetLife stating: "Now that you have the

requested documentation, please consider this our formal request to pay the

balance of the life insurance proceeds, representing the payment of accidental death and dismemberment proceeds, to Mrs. Kellogg." Id.

On June 22, 2005, MetLife personnel obtained information, via a web site called WebMDHealth, regarding the medications that the toxicology report found in Brad Kellogg's system at the time of his death. There is no indication in the administrative record that any medically-trained personnel were involved in this search or reviewed the search results.

On June 29, 2005, MetLife sent a letter to Kellogg's counsel stating as follows:

> We are writing in regard to the A D & D benefits that have been submitted.
>
> It will be necessary for us to evaluate this portion of the claim, therefore, completion of this claim will be delayed for a short period of time.
>
> When a decision has been made, we will notify you of our findings in a timely manner.

Id. at 156.

On July 6, 2005, Kellogg's counsel responded to MetLife's June 29, 2005 letter, stating in pertinent part:

> Thank you for your status letter dated June 29, 2005. Would it be possible for you to explain exactly what issues require further evaluation? Mr. Kellogg's death was determined to be an accident. What exclusions, if any in the policy, give your company reasons for concern?
>
> * * *

8

Please let me know what, if any, issues MetLife is concerned about.

Id. at 155.

MetLife did not, however, respond to Kellogg's counsel's request. On October 26, 2005, Kellogg's counsel sent another letter to MetLife expressing frustration with its delay in resolving the claim for AD&D benefits and threatening to file suit if MetLife did not reach a decision soon.

On November 17, 2005, MetLife sent a letter to Kellogg's counsel denying her claim for AD&D benefits. Id. at 129. The letter stated:

We have evaluated your client's claim for the referenced benefits. For the reasons detailed below, we must deny your client's claim.

The plan is an employee welfare benefit plan regulated by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001-1461. MetLife, as claim fiduciary, must administer claims in accordance with ERISA and the documents and instruments governing the plan.

The Plan states that Accidental Death and Dismemberment ("AD&D") benefits are payable if a plan participant dies as a result of an accident. Summary Plan Description at page 10. It goes on to state that, "The Pfizer AD&D Insurance Plan does not cover losses due to: . . . physical . . . illness." Summary Plan Description at page 12.

The police report submitted to us states that, according to a witness to the crash, after taking off from a stop sign, the decedent's vehicle veered into a tree. The witness stated that it appeared the decedent was having a seizure. She saw no attempt by the decedent to brake or avoid the tree. The police could find no other cause for the crash.

Under the terms of the plan, AD&D benefits are not payable if a loss is due to physical illness. The decedent's physical illness, the

9

seizure, was the cause of the crash. Accordingly, we must deny your claim.

Under ERISA, your client has the right to appeal this decision within sixty (60) days after the receipt of this letter. To do so, you must submit a written request for appeal to MetLife at the address above. Please include in the appeal letter the reason(s) you believe the claim was improperly denied, and submit any additional comments, documents, records or other information relating to your claim that you deem appropriate to enable MetLife to give your client's appeal proper consideration. Upon your written request, MetLife will provide you with a copy of the records and/or reports that are relevant to your client's claim.

MetLife will carefully evaluate all the information and advise you of its decision within sixty (60) days after the receipt of your client's appeal. If there are special circumstances requiring additional time to complete the review, we may take up to an additional sixty (60) days, but only after notifying you of the special circumstances in writing. In the event your client's appeal is denied in whole or in part, you have the right to bring a civil action under Section 502(a) of ERISA, 29 U.S.C. § 1132(a).

Id. at 129-30.

*Cherilyn Kellogg's attempt to administratively appeal*

On January 13, 2006, Kellogg's counsel sent a letter to MetLife stating:

Please be advised that this law firm . . . represent[s] Cherilyn Kellogg in connection with claims for payment of accidental death and dismemberment policy proceeds from MetLife as referenced above. We received Metropolitan Life's ("MetLife") November 17, 2005, letter and are appealing the decision to deny payment of benefits to Ms. Kellogg.

Having reviewed MetLife's November 17, 2005, letter, it appears that MetLife is basing its denial on an exclusion to coverage in the insurance policy. The letter references a police report in MetLife's possession which contains a witness statement to the effect that Mr. Kellogg "appeared" to be having a seizure. However, Mr. Kellogg

10

had no history of seizure activity and there is no reason, other than the witness's statement, to believe that a seizure was the cause of the accident. It is our position that there is simply insufficient factual and legal basis for MetLife to invoke the exclusion it refers to in the November 17, 2005, letter.

However, beyond making this statement, we are not in a position to intelligently appeal MetLife's denial. This is because the cause for Mr. Kellogg's accident are [sic] less than obvious. In addition, we do not know what information MetLife relied on in coming to its conclusion that Ms. Kellogg's claim is not valid. Finally, We [sic] are in need of additional documents and other information from MetLife. For these reasons, we ask for an extension of time in which to submit a complete appeal package for Ms. Kellogg.

In regards to the additional information we need, please send me a copy of MetLife's entire claim file in connection with Ms. Kellogg's claim. If MetLife obtained or relied on any reviews from individuals with medical training or other non-medical expertise as part of its investigation of Ms. Kellogg's claim, please provide a copy of that review or report, together with identification of the expert and information about his or her qualifications. In addition, we need a complete copy of the accidental death and dismemberment policy in place for Mr. Kellogg at the time of his death, a copy of the AD&D Certificate of Coverage, Summary Plan Description, plan documents and any and all other documents under which the ERISA plan established by Mr. Kellogg's employer, Pfizer, was established or operated. We make the request for these documents based on 29 U.S.C. § 1024(b)(4) and 29 C.F.R. § 2560.503-1.

Because some of these documents may be in the possession of Pfizer and because, in all likelihood, Pfizer is the plan administrator for Mr. Kellogg's ERISA plan, we are sending a copy of this letter to Pfizer and asking for its response and cooperation in providing documents it has in its possession and in ensuring that MetLife provides this information to us.

We also request that we have sixty days following receipt of these documents and information to evaluate them and present additional information to MetLife regarding Ms. Kellogg's claim.

We appreciate your prompt production of the materials we have requested in this letter.

Id. at 134-35.

On May 2, 2006, Kellogg's counsel, having received no response from MetLife, telephoned MetLife "to ascertain the status of [the] request that [he] sent to Met Life on January 13, 2006." Id. at 132. During the conversation, a MetLife representative "acknowledged . . . that MetLife [had] received a copy of th[e] [January 13, 2006] letter." Id. After finishing the telephone conversation, Kellogg's counsel drafted and sent to MetLife a letter stating, in pertinent part, as follows:

> We remain in need of additional documents and other information from MetLife. We do not know what information MetLife relied on in coming to its conclusion that Ms. Kellogg's claim is not valid.
>
> I again request that you send my law firm a copy of MetLife's entire claim file in connection with Ms. Kellogg's claim. If MetLife obtained or relied on any reviews from individuals with medical training or non-medical expertise as part of its investigation of Ms. Kellogg's claim, please provide a copy of that review or report, together with identification of the expert and information about his or her qualifications.
>
> In addition, we need a complete copy of the accidental death and dismemberment policy in place for Mr. Kellogg at the time of his death, a copy of the AD&D Certificate of Coverage, Summary Plan Description, plan documents and any and all other documents under which the ERISA plan established by Mr. Kellogg's employer, Pfizer [sic]. We make the request for these documents based on 29 U.S.C. § 1024(b)(4) and 29 C.F.R. § 2560.503-1.

Id. at 132-33.

That same day (May 2, 2006), Kellogg's counsel also telephoned Pfizer. Following that telephone call, Kellogg's counsel faxed Pfizer copies of the January 13 and May 2, 2006 letters he had sent to MetLife. On May 10, 2006, Pfizer sent Kellogg's counsel "copies of the AD&D Summary Plan Description and Certificate of Coverage." Id. at 198.

MetLife never provided Kellogg's counsel with any documents, nor did it ever issue a decision regarding her appeal.

*District court proceedings*

On July 26, 2006, Kellogg filed this action against MetLife and the Plan. Kellogg's complaint alleged, in pertinent part, that defendants were responsible, pursuant to 29 U.S.C. § 1132(a)(1)(B), "to pay [her] the AD&D benefits due under the Plan together with attorney fees and costs incurred . . . and pre and post-judgment interest to the date of payment of the unpaid benefits." Id. at 12.

On April 2, 2006, defendants moved for summary judgment based on the administrative record. On that same date, Kellogg filed a motion for partial summary judgment. On September 7, 2007, the district court issued a memorandum decision and order granting defendants' motion and denying Kellogg's motion. Kellogg has since filed a timely notice of appeal.

II.

*Standard of review - district court's grant of summary judgment*

"We review de novo the district court's summary judgment decision,

13

applying the same standard as the district court." Butler v. Compton, 482 F.3d 1277, 1278 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007). We examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006). Finally, we may affirm on any basis supported by the record, even though not relied on by the district court. Felix v. Lucent Techs., Inc., 387 F.3d 1146, 1163 n.17 (10th Cir. 2004).

*Standard of review to be applied in reviewing MetLife's decision*

In her first issue on appeal, Kellogg contends that the district court erred in applying a modified abuse of discretion standard, rather than a de novo standard, in reviewing MetLife's denial of benefits. A denial of benefits under an ERISA plan "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the benefit plan gives the administrator such discretion, then, absent procedural irregularities, the denial of benefits is reviewed under an arbitrary and capricious standard. Fought v. UNUM Life Ins. Co., 379 F.3d 997, 1003 (10th Cir. 2004). Such review is limited to "determining

14

whether [the] interpretation [of the plan] was reasonable and made in good faith."

Id.

The Plan at issue here named Pfizer as the "Plan Administrator" and MetLife as the "Claims Administrator." App. at 78. Further, the Plan afforded discretion to both Pfizer and MetLife:

> Benefits under these Plans will be paid only if the Plan Administrator or the Claims Administrator, as applicable, decides in its discretion that you are entitled to them. The Plan Administrator or the Claims Administrator, as applicable, shall make, in its sole discretion, all determinations arising in the administration, construction, or interpretation of these Plans, including the right to construe disputed or doubtful Plan terms and provisions, and any such determination shall be conclusive and binding on all persons, to the maximum extent permitted by law.

Id.

Kellogg acknowledges that these Plan provisions afforded MetLife "discretionary authority to interpret the terms of the insurance policy and to determine eligibility for benefits." Aplt. Br. at 18. She argues, however, that MetLife's failure to comply with the claims procedures set forth in the regulations implementing ERISA triggers de novo review. More specifically, she argues that MetLife's failure to ever issue a decision on her appeal results in there being "no timely discretionary act . . to which [this] court can defer." Id. at 22.

Defendants, in response, contend that Kellogg's arguments are based "on an inaccurate assumption that there was an appeal on which MetLife could render a decision." Aplee. Br. at 24. "In fact," they contend, "Kellogg never submitted

15

her final appeal." Id. In support of this contention, defendants note that "[i]n their letters, Kellogg's counsel state that they would submit Kellogg's appeal 60 days after they received the requested claim file documents," yet "Kellogg's counsel submitted neither the final appeal document nor any new evidence to support the appeal . . . ." Id. Thus, defendants argue, "there was no appeal or new evidence before MetLife that required any action." Id. at 25.

We readily reject defendants' arguments. The January 13, 2006 letter that Kellogg's counsel sent to MetLife very clearly stated, in its opening paragraph: "We received Metropolitan Life's . . . November 17, 2005, letter and *are appealing the decision to deny payment of benefits to Ms. Kellogg*." App. at 134 (italics added). The letter then proceeded to outline the general basis for Kellogg's appeal:

> Having reviewed MetLife's November 17, 2005, letter, it appears that MetLife is basing its denial on an exclusion to coverage in the insurance policy. The letter references a police report in MetLife's possession which contains a witness statement to the effect that Mr. Kellogg "appeared" to be having a seizure. However, Mr. Kellogg had no history of seizure activity and there is no reason, other than the witness's statement, to believe that a seizure was the cause of the accident. It is our position that there is simply insufficient factual and legal basis for MetLife to invoke the exclusion it refers to in the November 17, 2005, letter.

Id.

To be sure, the letter also stated that Kellogg's counsel were "not in a position to intelligently appeal MetLife's denial" because "the cause for Mr.

16

Kellogg's accident [was] less than obvious," and because they "d[id] not know what information MetLife relied on in coming to its conclusion that Ms. Kellogg's claim [wa]s not valid." Id. at 134-35. On those points, however, Kellogg's counsel specifically requested that MetLife send them "a copy of MetLife's entire claim file," including "a complete copy of the accidental death and dismemberment policy in place for Mr. Kellogg at the time of his death, a copy of the AD&D Certificate of Coverage, Summary Plan description, plan documents," and any reviews or reports prepared for MetLife "from individuals with medical training or other non-medical expertise." Id. at 135. In addition, Kellogg's counsel requested that they be given "sixty days following receipt of these documents and information to evaluate them and present *additional information* to MetLife regarding Ms. Kellogg's claim." Id. (italics added).

Considered as a whole, there can be no doubt that the January 17, 2006 letter provided MetLife with notice that Kellogg disagreed with and was appealing MetLife's decision to deny her AD&D benefits, and was also requesting from MetLife relevant documentation, including the SPD, Certificate of Insurance, and relevant medical and non-medical reports, in order to support her appeal. Thus, MetLife clearly had a responsibility under ERISA to provide Kellogg's counsel with a copy of the latest SPD and plan documentation, see 29 U.S.C. § 1024(b)(4), and, ultimately, to issue a decision on Kellogg's appeal, see 29 C.F.R. §§ 2560.503-1(i)(1)(i) (requiring a plan administrator to issue a

17

decision on an appeal within sixty days after receipt of the claimant's request for review), and 2560.503-1(i)(4) ("For purposes of paragraph (i) of this section, the period of time within which a benefit determination on review is required to be made shall begin at the time an appeal is filed in accordance with the reasonable procedures of a plan, without regard to whether all the information necessary to make a benefit determination on review accompanies the filing."). According to the record on appeal, MetLife did neither. Nor did MetLife make any attempt to contact Kellogg or her attorneys to determine if they were going to submit any additional evidence or arguments.

Although defendants do not acknowledge, much less attempt to justify, MetLife's failure to respond in any manner to Kellogg's January 17, 2006 letter, they suggest that MetLife's failure effectively prevented Kellogg's appeal from ripening. That suggestion, however, clearly ignores the substance of Kellogg's January 17, 2006 letter, and is inconsistent with both the letter and spirit of ERISA and its implementing regulations. To conclude otherwise would provide plan administrators with an incentive to violate the provisions of ERISA by ignoring requests by plan participants and beneficiaries for plan documentation and other relevant information.

The question, then, is what impact, if any, MetLife's failure to respond has on the standard of review to be applied by this court. When a plan administrator fails to exercise its discretion and render a decision within the requisite

18

administrative review period set forth in ERISA's implementing regulations, we have, to date, applied a "substantial compliance rule." Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan, 379 F.3d 1168, 1173 (10th Cir. 2004) (internal quotation marks omitted). "Pursuant to this rule, a plan administrator is in substantial compliance with th[e] deadline if the delay is (1) 'inconsequential'; and (2) in the context of an on-going, good-faith exchange of information between the administrator and the claimant." Id. at 1173-74 (quoting Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003)). If the plan administrator is not in substantial compliance with the deadline, we have applied a de novo standard of review. Id.

We note, however, that our "substantial compliance" rule was issued in light of the then-controlling 1998 federal regulations implementing ERISA. See id. at 1176 n.6 (discussing history of substantial compliance rule). In January 2002, amendments to the regulations took effect that have called into question the continuing validity of the substantial compliance rule. Id. At least one district court in this circuit has since held "that the substantial compliance doctrine is not applicable under the revised regulations," Reeves v. UNUM Life Ins. Co., 376 F. Supp. 2d 1285, 1293 (W.D. Okla. 2005), and that "'a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference.'" Id. at 1294 (quoting 65 Fed. Reg. 70246, 70255 (Nov. 21, 2000)).

19

We find it unnecessary to conclusively decide the continuing validity of the "substantial compliance" rule because, even assuming its continued existence, there can be little doubt that MetLife was not in "substantial compliance" with the ERISA deadlines. Indeed, there was no compliance at all on MetLife's part; as noted, MetLife wholly ignored Kellogg's counsel's request for documentation and review of MetLife's decision to deny AD&D benefits. Thus, we shall proceed to apply a de novo standard in reviewing MetLife's initial decision.

*Is MetLife precluded from arguing Brad Kellogg's death was not "accidental"?*

In its motion for summary judgment, MetLife argued, in part, that Kellogg was not entitled to AD&D benefits under the Plan because Brad Kellogg's death was not "accidental." App. at 499. The district court agreed with MetLife. Id. at 786-87.

Kellogg argues on appeal, as she did below, that MetLife is precluded from "argu[ing] for the first time in [this] litigation that [her] claim fails because [Brad] Kellogg's death did not result from an accident, 'independent of other causes.'" Aplt. Br. at 38; see App. at 620. In support of this contention, Kellogg argues that MetLife's denial letter of November 17, 2005 "set[] forth only one specific reason for the denial of [her] claim: the exclusion of losses due to a physical illness." Aplt. Br. at 35. Further, Kellogg argues that "the 'independent of other causes' language does not even appear in the Plan's SPD, the only document MetLife referred [her] to in its November 17, 2005 denial letter . . . ."

20

Id. at 38.

In support of her position, Kellogg points to our decision in Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180 (10th Cir. 2007). In Flinders, we held that "[i]n reviewing a plan administrator's decision," we "may only consider the evidence and arguments that appear in the administrative record." 491 F.3d at 1190. "This means," we held, that we must "consider only the rationale asserted by the plan administrator in the administrative record . . . ." Id.

Defendants do not dispute the Flinders holding, but instead take issue with Kellogg's interpretation of MetLife's November 17, 2005 denial letter as relying solely upon the physical illness exclusion. According to defendants, that letter first "stated that accidental death benefits are payable only 'if a plan participant dies as a result of an accident.'" Aplee. Br. at 31 (quoting App. at 129). Defendants contend that the letter then "noted that the Plan excludes accidental death coverage for 'losses due to . . . physical . . . illness.'" Id. In addition, defendants assert, "MetLife consistently referred to the event leading to the Decedent's death as a 'crash' rather than an 'accident' in accordance with its view of the Decedent's death as not being accidental." Id. at 31-32. Lastly, defendants note that "MetLife also stated that based on the evidence in the record, there was 'no other cause for the crash' than the Decedent's seizure, which, once again, indicated that there had not been an accident under the terms of the Plan." Id. at

32. In sum, defendants argue that "MetLife based its claim determination on both the lack of an 'accident' within the terms of the Plan and the physical illness exclusion." Id.

To resolve this issue, we return to the language of MetLife's November 17, 2005 denial letter. The key portion of that letter stated as follows:

> The Plan states that Accidental Death and Dismemberment ("AD&D") benefits are payable if a plan participant dies as a result of an accident. Summary Plan Description at page 10. It goes on to state that, "The Pfizer AD&D Insurance Plan does not cover losses due to: . . . physical . . . illness." Summary Plan Description at page 12.
>
> The police report submitted to us states that, according to a witness to the crash, after taking off from a stop sign, the decedent's vehicle veered into a tree. The witness stated that it appeared the decedent was having a seizure. She saw no attempt by the decedent to brake or avoid the tree. The police could find no other cause for the crash.
>
> Under the terms of the plan, AD&D benefits are not payable if a loss is due to physical illness. The decedent's physical illness, the seizure, was the cause of the crash. Accordingly, we must deny your claim.

App. at 129.

Although it is true, as noted by defendants, that the letter makes reference to the Plan providing AD&D benefits in the event "a plan participant dies as a result of an accident," the remainder of the letter focuses exclusively on the "physical illness" exclusion. In particular, the letter first quotes the language of that exclusion, and then proceeds to conclude that, based on the available information, Brad Kellogg's "physical illness, the seizure, was the cause of the

22

crash." Id. On that basis alone does MetLife deny Kellogg's claim for AD&D benefits. In other words, contrary to defendants' assertion, the letter cannot reasonably be interpreted as denying AD&D coverage on the basis that Brad Kellogg was not involved in, or injured as a result of, an "accident." Thus, it was error for the district court to have granted summary judgment in favor of MetLife on the grounds that Brad Kellogg did not die as a result of an "accident."

*Was Brad Kellogg's death "caused" by his purported seizure?*

The sole basis relied on by MetLife for denying Kellogg's claim for AD&D benefits was its conclusion that Brad Kellogg's "physical illness, the seizure, was the cause of the crash." App. at 129. Applying a de novo standard of review, however, we conclude that the car crash – not the seizure – caused the loss at issue, i.e., Brad Kellogg's death, and therefore the exclusionary clause of the policy does not apply.[1]

We have long held that insurance policies are interpreted according to their plain meaning. See, e.g., Webb v. Allstate Life Ins. Co., 536 F.2d 336, 339 (10th Cir. 1976) ("Terms of an insurance policy must be considered not in a technical but in a popular sense, and must be construed according to their plain, ordinary

---

[1] Given this conclusion, we find it unnecessary to determine whether Brad Kellogg's purported seizure constituted a "physical illness" within the meaning of the plan.

23

and accepted sense in the common speech of men . . . .").[2]  Furthermore, "[i]nsurance contracts, because of the inequality of the bargaining position of the parties, are construed strictly against the insurer."  Mutual of Omaha Ins. Co. v. Russell, 402 F.2d 339, 345 n.19 (10th Cir. 1968).

These rules of construction apply equally to ERISA cases governed by federal common law.  See Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1249 (10th Cir. 2007) ("[A]pplying federal common law, we determine that the proper inquiry is not what [the insurer] intended a term to signify; rather, we consider the common and ordinary meaning as a reasonable person in the position of the [plan] participant would have understood the words to mean.") (internal quotation marks and ellipsis omitted; third alteration in original); see also Jones v. Metro. Life Ins. Co., 385 F.3d 654, 664 (6th Cir. 2004) ("[F]ederal common law--from pre-Erie diversity cases to present day ERISA cases--focuses upon the expectations and intentions of the insured.").  Likewise, the doctrine of *contra proferentem*, which requires us to construe all ambiguities against the drafter, applies here.  See Miller, 502 F.3d. at 1253 (adopting rule that *contra*

_____

[2]  One of the most frequently cited cases in this regard is Silverstein v. Metro. Life Ins. Co., 171 N.E. 914, 915 (N.Y. 1930), where Judge Cardozo wrote, "Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract.  A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules." (internal citations and quotation marks omitted).

24

*proferentum* applies to de novo review of ERISA plans).[3]

The First Circuit dealt with facts very similar to the instant case in <u>Vickers</u> <u>v. Boston Mutual Life Insurance Co.</u>, 135 F.3d 179 (1998) (applying ERISA). The insured suffered a heart attack while driving and died after crashing into a tree. <u>See</u> <u>id.</u> at 180. The accidental death policy excluded "loss resulting from . . . sickness, disease or bodily infirmity." <u>Id.</u> The death certificate listed the cause of death as "[m]ultiple blunt force traumatic injuries secondary to motor vehicle accident precipitated by acute coronary insufficiency." <u>Id.</u>

The insurance company argued that "[t]he nexus between the heart attack and the bodily injuries suffered from the crash was immediate and should be viewed as one entire event even though the heart attack was not the physiological cause of the decedent's death[,]" <u>id.</u> at 181-82, to which the court responded, "[t]his is no answer when we are interpreting the word 'cause' in a layman's insurance policy[,]" <u>id.</u> at 182. The court explained that while the heart attack caused the crash, the crash was the sole cause of the death. <u>Id.</u> The court acknowledged that there would have been no crash (and therefore no loss) but for the insured's heart attack, but rejected the insurer's attempts to justify the exclusion through a complicated analysis of proximate cause. <u>Id.</u> at 181. The

---

[3] "Insurance contract language is ambiguous if it is reasonably susceptible of different interpretations or if any ordinary person in the shoes of the insured would not understand that the policy did not cover claims such as those brought." <u>Pelkey v. Gen. Elec. Capital Assur. Co.</u>, 804 A.2d 385, 387 (Me. 2002).

court instead emphasized the importance of viewing the policy as an ordinary policyholder would. Id. at 181-82.

We followed this approach in Johnson v. Life Investors' Insurance Co., 98 Fed. Appx. 814 (10th Cir. 2004) (unpublished opinion) (applying Utah law). While Johnson is not binding precedent, we find it persuasive and adopt its reasoning here. In that case, the insured (who suffered from muscular dystrophy and had a history of falls) fell down his basement stairs and broke his neck. Id. at 815. After being admitted to the hospital, he developed pneumonia and died. Id. According to his physician, the immediate cause of death was "pneumonia due to, or as a consequence of, a cervical spine fracture, and the underlying cause of death [w]as myotonic dystrophy." Id. The policy at issue excluded coverage "for any *loss* resulting from any injury caused or contributed to by, or as a consequence of . . . any sickness or infirmity." Id. at 818 (internal quotation marks omitted) (emphasis in original). Strictly construing the language against the insurer, we determined that "coverage is denied under this policy only where the illness causes the hospitalization and death . . . and not where the illness causes an accident that causes the death . . . ." Id. We noted that the insurer could have written the policy in such a way as to exclude accidents caused by illness (rather than only losses caused by illness). Id. We concluded, "[s]ince it is undisputed that the immediate cause of [the insured]'s loss was a fall, it is irrelevant under the terms of this policy whether the fall was caused by his

26

myopic dystrophy." Id.

The Minnesota Supreme Court employed similar reasoning in Orman v. Prudential Insurance Co., 296 N.W.2d 380 (1980). In that case, the insured lost consciousness due to the bursting of a cerebral aneurysm and fell into the bathtub and drowned. Id. at 381. The policy excluded losses "caused or contributed to by bodily infirmity or disease." Id. (internal ellipsis omitted). The court held for the insured. See id. at 383. Although the aneurysm was a disease under the policy, it did not cause the death and therefore was not excluded:

> It was a mere fortuity that the decedent stood over a bathtub full of water at the time the aneurysm burst and rendered her unconscious. In other words, the aneurysm may have contributed to the accident, but it did not contribute to the death. In such circumstances, the aneurysm is simply too remote to be deemed a direct or contributing cause of death.

Id. at 382.

Similarly, in National Life & Accident Insurance Co. v. Franklin, 506 S.W.2d 765, 766 (Tex. App. 1974), the insured, who had a history of epileptic seizures, was found dead in the bathtub; the cause of death was accidental death by drowning. The insurance policy covered losses resulting "directly and independently of all other causes, from bodily injuries effected solely through external, violent and accidental means," and contained an exclusionary clause prohibiting payment for losses that "result[] from or [are] contributed to by any disease or mental infirmity." Id. The court assumed that even if the insured's

27

epilepsy caused him to lose consciousness and fall into the bathtub, it did not cause death by drowning. Id. at 767. The court explained, "[t]he epilepsy was merely a cause of a cause and was therefore too remote to bar recovery." Id.

As these cases make clear, courts have long rejected attempts to preclude recovery on the basis that the accident would not have happened but for the insured's illness. As then-Judge Taft wrote in Manufacturers' Accident Indemnity Co. v. Dorgan, 58 F. 945, 954 (6th Cir. 1893),

> [I]f the deceased suffered death by drowning, no matter what was the cause of his falling into the water, whether disease or a slipping, the drowning, in such case, would be the proximate and sole cause of the disability or death, unless it appeared that death would have been the result, even had there been no water at hand to fall into. The disease would be but the condition; the drowning would be the moving, sole, and proximate cause.

See also Browning v. Equitable Life Assur. Soc., 72 P.2d 1060, 1076 (Utah 1937) ("A sick man may be the subject of an accident which would not have befallen him but for his sickness. One may meet his death by falling into a place of danger in a faint or in a fit of epilepsy. But an event has usually been held to be the result of an accident, not of disease.").[4]

---

[4] Many cases that appear to have similar fact patterns but that hold for the insurer are actually cases where the loss was caused by the illness rather than the accident. See, e.g., Crosswhite v. Reliance Standard Life Ins. Co., 259 F. Supp. 2d 911, 918-19 (E.D. Mo. 2003) (applying ERISA) (stroke, not motor vehicle accident, was the immediate cause of death and is therefore excluded); Kolowski v. Metro. Life Ins. Co., 35 F. Supp. 2d 1059, 1064 (N.D. Ill. 1998) (applying Illinois law) (heart attack following stressful work and heavy lifting falls under policy exclusion for disease because it was the cause of death); State v. Arbuckle,

(continued...)

28

In its explanation of the insurance plan to its employees, Pfizer's SPD stated, "If you die as a result of, and within 12 months after, an accident, your beneficiary will receive 100 percent of your AD&D coverage." App. at 68. The SPD advised that the Plan "does not cover losses due to: . . . physical or mental illness, or diagnosis or treatment for the illness." Id. at 69. MetLife's Certificate of Insurance worded the exclusion slightly differently: "We will not pay benefits under this section for any loss caused or contributed to by: [] physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity . . . ." Id. at 293.

Here, the loss (Brad Kellogg's death) was caused by a skull fracture resulting from the car accident, not by physical or mental illness. See id. at 109 (Letter from Stephen Morris, Merced County Sheriff's Department's Deputy Coroner). While the seizure may have been the cause of the crash, it was not the cause of Brad Kellogg's death. The Plan does not contain an exclusion for losses due to accidents that were caused by physical illness, but rather excludes only losses caused by physical illness.[5] Because there is no evidence that the seizure

---

[4](...continued)
941 P.2d 181, 185 (Alaska 1997) (applying state law) (coverage excluded as the direct or indirect cause of death where heart attack occurred following heavy lifting).

[5] MetLife could have drafted the policy to exclude losses resulting from accidents caused by injury or illness. For examples of policies that contain such an exclusion, see Southern Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 100
(continued...)

caused Brad Kellogg's death, MetLife's argument fails.

The fact that the policy at issue here excludes losses that were caused *or contributed* to by physical illness does not change this analysis. A reasonable policyholder would understand this language to refer to causes contributing to the death, not to the accident.[6] See Orman, 296 N.W.2d at 382 (rejecting insurer's argument that "caused or contributed to" language excludes illnesses contributing to the accident but not the death); Franklin, 506 S.W.2d at 768 ("The words 'contributed to' do not serve to allow us to look back along the chain of causation to a remote cause or a cause of a cause."). Notably, this understanding of the policy's plain meaning is supported by Pfizer's own interpretation of MetLife's coverage: the SPD describes the plan as excluding only losses "due to" physical illness. See App. at 69.

Having rejected the sole basis upon which MetLife grounded its denial of AD&D benefits, we must reverse the judgment of the district court and remand

---

[5](...continued) (5th Cir. 1993) ("A loss that is the result of or contributed to by one of the following is not a covered loss even though it was caused by an accidental bodily injury: (1) A disease or infirmity of the mind or body."); Sekel v. Aetna Life Insurance Co., 704 F.2d 1335, 1336-37 (5th Cir. 1983) ("[N]o payment shall be made for. . . any loss resulting from any injury caused or contributed to by, or as a consequence of, any of the following excluded risks, even though the proximate or precipitating cause of loss is accidental bodily injury: (a) bodily or mental infirmity; or (b) disease. . . ." (internal quotation marks omitted)).

[6] And, in any event, MetLife did not rely on the "contributed to" language in denying Kellogg's claim for benefits.

with directions to enter judgment in favor of Kellogg on the administrative record.

*Prejudgment interest and attorney fees*

In her final issue on appeal, Kellogg argues that, if we reverse the district court's judgment, we should instruct "the district court [on remand to] provide [her] with an award of prejudgment interest and attorney fees." Aplt. Br. at 49. Because the award of prejudgment interest and fees is a matter that lies within the discretion of the district court, see 29 U.S.C. § 1132(g)(1) (addressing fees); Allison v. Bank One-Denver, 289 F.3d 1223, 1243 (10th Cir. 2002) (addressing prejudgment interest), we conclude that the better course is to direct the district court on remand to consider, in the first instance, whether Kellogg is entitled to fees or prejudgment interest.

The judgment of the district court is REVERSED and the case REMANDED with directions to enter judgment in favor of Cherilyn Kellogg. The district court is also directed on remand to consider whether Cherilyn Kellogg is entitled to attorney fees and prejudgment interest.