FILED
United States Court of Appeals
Tenth Circuit

December 29, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TERRI HANCOCK,

        Plaintiff - Appellant,

v.

METROPOLITAN LIFE INSURANCE
COMPANY,

        Defendant - Appellee.

No. 08-4161

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:06-CV-00882-DAK)**

Brian S. King (Marcie E. Schaap, with him on the briefs), Salt Lake City, Utah,
for Plaintiff - Appellant.

Jack M. Englert, Jr., Holland & Hart LLP, Greenwood Village, Colorado,
(James L. Barnett, Holland & Hart LLP, Salt Lake City, Utah, with him on the
brief), for Defendant - Appellee.

Before **HARTZ**, **HOLLOWAY**, and **TYMKOVICH**, Circuit Judges.

**HARTZ**, Circuit Judge.

        Terri Hancock challenges the denial by Metropolitan Life Insurance

Company (MetLife) of accidental-death-and-dismemberment (AD&D) benefits for

the death of her mother, Verla Hancock. Applying arbitrary-and-capricious review, the United States District Court for the District of Utah affirmed MetLife's decision. On appeal Ms. Hancock contends (1) that judicial review of MetLife's decision should be de novo because the clause of her mother's benefit plan giving MetLife discretion in reviewing claims does not comply with a Utah insurance regulation governing discretion-granting clauses; (2) that even if the discretion-granting clause is valid, judicial deference to the MetLife decision should be significantly reduced because of procedural irregularities in processing the claim and MetLife's conflict of interest; and (3) that MetLife's decision should be reversed regardless of the judicial standard of review.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. As the parties agree, Verla Hancock's benefit plan is governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. ERISA preempts the Utah insurance regulation relied upon by Ms. Hancock; she has not shown any procedural irregularities in MetLife's review of her claim; and MetLife's decision was not arbitrary and capricious, even taking into account its conflict of interest.

I.     FACTUAL BACKGROUND

A.     Verla Hancock's Death

On November 18, 2004, having not heard from her mother for several days, Ms. Hancock went to her mother's house to check on her. She found Verla

Hancock's body on the bathroom floor. The body was already in advanced stages of decomposition. According to the police report,

> [Verla Hancock] was lying on the floor with her head under the toilet. Her pants were pulled down and there was what appeared to be feces on the floor and also on her back, staining her shirt.
>
> There was a shower chair in the bathroom that had been knocked over and one leg of it was lying across the right side of her face and there was an open storage container that was lying next to her body with misc items scattered around the floor. There was also a prescription bottle of what was later identified as Oxycontin next to her right hand. It appeared to have fallen out of the storage container. That was the only prescription bottle found in the bathroom.

Admin. R. at 226–27. Elsewhere in the house, police found eight other kinds of prescription drugs. Ms. Hancock told police that her mother had suffered from diabetes, hypertension, sleep apnea, and depression. Ms. Hancock also said that her mother had been addicted to painkillers and had overdosed on Oxycontin and Lortab in August 2003 (though she did not know whether the reason for the overdose was attempted suicide or inadvertence). Additionally, police interviewed three neighbors and Verla Hancock's brother, who said that he had last spoken with his sister five days before she was found.

Although the medical examiner thought that Verla Hancock may have overdosed on Oxycontin, there was "no evidence of excessive amounts of Oxycontin or other intoxicants" in the toxicology results. *Id.* at 217. Nor did the autopsy find any "evidence of natural disease, injury or intoxication sufficient to

explain death." *Id.* The medical examiner's report concluded that the cause of death was undetermined, and Verla Hancock's death certificate so stated.

### B. The Plan

Verla Hancock participated in a group-benefits plan (the Plan) sponsored by her employer, Intermountain Health Care. MetLife is the Plan's insurer and claim fiduciary. As claim fiduciary, MetLife resolves benefit claims and reviews appeals.

Verla Hancock's coverage under the Plan included basic life insurance, optional additional life insurance, and AD&D benefits. The Plan pays AD&D benefits for loss of life if (1) the insured is injured in an accident that occurs while she is under AD&D coverage; (2) "that accident is the sole cause of the injury"; (3) "that injury is the sole cause of [death]"; and (4) "[death] occurs not more than one year after the date of that accident." *Id.* at 40. Under the Plan, AD&D benefits "will be paid when [MetLife] receive[s] notice and satisfactory proof of that loss." *Id.* at 43. Excluded from AD&D coverage is loss that "in any way results from, or is caused or contributed to by . . . physical or mental illness, diagnosis of or treatment for the illness." *Id.* at 45–46. The Plan also provides for an appeals process entitling an unsuccessful claimant "to request that MetLife conduct a review of the adverse benefit determination." *Id.* at 68.

Of central importance to this appeal, the Plan grants MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and

entitlement to Plan benefits in accordance with the terms of the Plan." *Id.* at 69. The Utah insurance commissioner, however, has attempted to limit by regulation such grants of discretion. Utah Admin. Code r.590-218 (2003) (Rule 590-218) prohibits discretion-granting clauses in insurance forms other than those relating to benefit plans governed by ERISA; and permits them in ERISA plans only if their language is "substantially similar" to the safe-harbor language set forth in the regulation, *id.* § 5(2).

## C.    MetLife's Claim Determination

Ms. Hancock is her mother's Plan beneficiary. On January 20, 2005, MetLife received her claim for life and AD&D payments. It approved the claims under basic and optional coverage but denied AD&D benefits. Its March 22 notification letter to Ms. Hancock explained that because accidental death had not been established, she was ineligible for AD&D benefits.

On May 19 Ms. Hancock sent MetLife a letter appealing the denial of AD&D benefits. She provided her own observations of the scene of death and reported on two conversations with those who had investigated the death: according to her letter, the investigating detective said that "it looked like [Verla Hancock] slipped, fell, and hit her head," and the medical examiner told her that it "was entirely possible" that Verla Hancock "slipped, fell and hit her head hard enough to render her unconscious but not hard enough to fracture her skull." Admin. R. at 174. MetLife denied her appeal on September 1. It characterized

Ms. Hancock's evidence as conjecture and reiterated that she had not shown that her mother's death had been caused by an accident.

Ms. Hancock obtained counsel and appealed again on February 6, 2006. This time she submitted copies of the police report, police photographs of the scene, autopsy documents, and an investigative report prepared by MRA Forensic Sciences, a firm she had hired. MetLife agreed to conduct further administrative review but had rendered no decision by June 27, when Ms. Hancock's counsel demanded that MetLife pay AD&D benefits within ten days or be sued. On September 12, 2006, still without word on her appeal, Ms. Hancock filed suit against MetLife in Utah state court, alleging breach of contract, breach of the duty of good faith and fair dealing, and other claims. One day later, MetLife sent her a letter reaffirming its denial of benefits. The case was later removed to federal court on MetLife's motion.

### D. District-Court Review

The district court was presented with three motions by the parties. On December 10, 2007, Ms. Hancock moved for a partial summary judgment on the standard of review, contending that the court should review de novo the denial of benefits by MetLife. She argued that Rule 590-218 deprived MetLife of any discretionary authority that would justify judicial deference. On February 8, 2008, MetLife moved for a bench trial on the papers. It argued that its decision was reasonable and supported by substantial evidence. About two weeks later,

Ms. Hancock moved for summary judgment. She characterized MetLife's denial of benefits as an "attempt[] to invoke a policy exclusion, presumably that there was insufficient evidence to support the claim," Aplt. App., Vol II. at 263, and asserted that MetLife had the burden of establishing the factual basis for the exclusion. She also argued that MetLife had a conflict of interest and had committed procedural irregularities in handling her claim.

The district court issued an opinion addressing each motion and ruling on the merits. *See Hancock v. Metro. Life Ins. Co.*, No. 2:06-CV-00882DAK, 2008 WL 2996723 (D. Utah Aug. 1, 2008). It denied Ms. Hancock's motion for partial summary judgment, holding that ERISA preempted Rule 590-218 and that MetLife was entitled to arbitrary-and-capricious review. Responding to Ms. Hancock's summary-judgment motion, the court determined that MetLife's denial was based not on a Plan exclusion but on Ms. Hancock's failure to satisfy her burden to show that a covered loss had occurred. Finally, denying Ms. Hancock's summary-judgment motion and granting MetLife's motion to resolve the merits, the court held that MetLife's decision to deny AD&D benefits was not arbitrary and capricious. It therefore dismissed Ms. Hancock's claims.

## II.   DISCUSSION

On appeal Ms. Hancock raises two issues: (1) whether MetLife is entitled to deferential review, and (2) whether its decision survives our review. We begin with the standard of review.

## A. Standard of Review

As the Supreme Court stated in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If the administrator or fiduciary has discretionary authority, "then, absent procedural irregularities, the denial of benefits is reviewed under an arbitrary and capricious standard." *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 825 (10th Cir. 2008). When, as here, the district court's determination of the standard of review did not require it to resolve any disputed historical facts, we do not defer to its determination but decide de novo what the standard of review should be. *See Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009).

The Plan contains the following provision entitled, "Discretionary Authority of Plan Administrator and Other Plan Fiduciaries":

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and [e]ffect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

Admin. R. at 69–70.  There is no dispute that the clause gives MetLife discretion in interpreting Plan terms and determining benefit eligibility.  The question is whether the clause is valid.  Ms. Hancock contends that it is invalid because it fails to comply with Utah's insurance Rule 590-218; therefore, she reasons, MetLife lacks discretionary authority and its decision must be reviewed de novo.  MetLife counters, however, that ERISA expressly preempts the application of the rule in this case.[1]  Ms. Hancock argues against preemption, and alternatively contends that even if the Plan's discretion-granting clause is valid, we must temper our deference because of procedural defects in MetLife's benefit determination and MetLife's conflict of interest.  We first answer the preemption question, and then address Ms. Hancock's procedural-defect and conflict-of-interest arguments.

### 1.    ERISA Preemption

Rule 590-218-5(1) imposes a ban on reservation-of-discretion clauses in insurance-policy forms.  An exception, however, is provided for employee-benefit plans governed by ERISA.  Rule 590-218-5(2) authorizes reservation-of-discretion clauses in such plans if the clause language "is the same as, or substantially similar to" the following safe-harbor language:

---

[1]On appeal MetLife also argues that the rule is preempted by conflict preemption.  But because it did not raise this issue below, we need not address it. *See Karr v. Hefner*, 475 F.3d 1192, 1199 (10th Cir. 2007).

Benefits under this plan will be paid only if (the plan administrator) decides in its discretion that (the claimant) is entitled to them. (The plan administrator) also has discretion to determine eligibility for benefits and to interpret the terms and conditions of the benefit plan. Determinations made by (the plan administrator) pursuant to this reservation of discretion do not prohibit or prevent a claimant from seeking judicial review in federal court of (the plan administrator's) determinations.

The reservation of discretion made under this provision only establishes the scope of review that a federal court will apply when (a claimant) seeks judicial review of (the plan administrator's) determination of eligibility for benefits, the payment of benefits, or interpretation of the terms and conditions applicable to the benefit plan.

(The plan administrator) is an insurance company that provides insurance to this benefit plan and the federal court will determine the level of discretion that it will accord (the plan administrator's) determinations.

Rule 590-218-5(3) (internal quotation marks omitted). The "[p]arenthes[e]s [in the rule] indicate that the company filing the form may use a name or pronouns as applicable."[2] *Id.* The rule also dictates that discretion-granting clauses be

_____

[2]Rule 590-218 in its entirety provides as follows:

**R590-218. Permitted Language for Reservation of Discretion Clauses.**
**R590-218-1. Authority.**

This rule is promulgated pursuant to Subsections 31A-2-201(1) and 31A-2-201(3)(a) in which the commissioner is empowered to administer and enforce this title and to make rules to implement the provisions of this title. Further authority to regulate the use of reservation of discretion clauses in forms filed by insurers with the department is found in Subsections 31A-21-201(3) and 31A-21-314(2).

**R590-218-2. Purpose.**

This rule prohibits the use of reservation of discretion clauses in forms that are not associated with ERISA employee benefit plans. It creates a safe harbor for insurance companies that provide insurance to

(continued...)

[2](...continued)
ERISA employee benefit plans sponsored by employers, allowing insurers to know what language in insurance forms is acceptable to the department.

**R590-218-3.  Applicability.**

This rule applies to all forms filed with the department, regardless of the insurance line or type of form.

**R590-218-4.  Definitions.**

For the purpose of this rule the commissioner adopts the definitions set forth in Section 31A-1-301 and the following:

(1) "Employee benefit plan" means an employee welfare benefit plan as defined in 29 U.S.C. 1002(1) or an employee pension benefit plan as defined in 29 U.S.C. 1002(2) or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

(2) "ERISA" means the Employee Retirement Income Security Act of 1974.

(3) "ERISA employee benefit plan" means an employee benefit plan subject to ERISA.

(4) "Form" is used as defined in Section 31A-1-301.

(5) "Reservation of discretion clause" means language in a form that purports to reserve discretion to interpret the terms of the contract, to determine eligibility for benefits under the plan, or to establish a scope of judicial review or standards of interpretation, to the plan administrator, the insurance company acting in the capacity of a plan administrator in an employee benefit plan, or the insurance company acting as the insurer.

**R590-218-5.  Reservation of Discretion Clauses Prohibited - Exception - Safe Harbor Language.**

(1)  The commissioner finds reservation of discretion clauses in forms to be in violation of Subsections 31A-21-201(3) and 31A-21-314(2). Accordingly, such clauses are not permitted in a form unless provided otherwise by this rule.  Any reservation of discretion language previously accepted or approved by the department is hereby prohibited.  Any use of reservation of discretion clause in a form required to be filed with the department is a violation of Subsections 31A-21-201(3) and 31A-21-314(2) and is prohibited, regardless of whether the form has been filed with or prohibited by the department.

(2)  Notwithstanding Subsection (1), a reservation of discretion

(continued...)

clause may be included in a form if the form is used only in ERISA employee benefit plans and the reservation of discretion clause has language that is the same as, or substantially similar to, the language in Subsection (3).

(3)  The following language may be used in a reservation of discretion clause in forms filed for use in ERISA employee benefit plans (Parenthesis indicate that the company filing the form may use a name or pronouns as applicable):

"Benefits under this plan will be paid only if (the plan administrator) decides in its discretion that (the claimant) is entitled to them.  (The plan administrator) also has discretion to determine eligibility for benefits and to interpret the terms and conditions of the benefit plan.  Determinations made by (the plan administrator) pursuant to this reservation of discretion do not prohibit or prevent a claimant from seeking judicial review in federal court of (the plan administrator's) determinations.

The reservation of discretion made under this provision only establishes the scope of review that a federal court will apply when (a claimant) seeks judicial review of (the plan administrator's) determination of eligibility for benefits, the payment of benefits, or interpretation of the terms and conditions applicable to the benefit plan.

(The plan administrator) is an insurance company that provides insurance to this benefit plan and the federal court will determine the level of discretion that it will accord (the plan administrator's) determinations."

(4)  A reservation of discretion clause in a form that is used in an ERISA employee benefit plan must be highlighted in the form by use of a bold font that is not less than 12 point type.

## R590-218-6.  Filing Procedures.

Rather than filing multiple forms for ERISA employee benefit plans and benefit plans not subject to ERISA, an insurer may elect to file one form with the department that has the reservation of discretion language included as a variable element, between brackets, with an accompanying notation stating that the reservation of discretion language will only be included in forms used for ERISA employee benefit plans.

## R590-218-7.  Severability.

If any provision or clause of this rule or its application to any person or situation is held invalid, such invalidity may not affect any other provision

(continued...)

highlighted . . . by use of a bold font that is not less than 12 point type."
Rule 590-218-5(4).

Rule 590-218 can be applied to the Plan only if it is not preempted by
ERISA. ERISA expressly preempts any state law "insofar as [it] may now or
hereafter relate to any employee benefit plan," *see* 29 U.S.C. § 1144(a), unless the
law "regulates insurance, banking, or securities," *id.* § 1144(b)(2)(A). The issue
before us is whether Rule 590-218 regulates insurance. The Supreme Court has
declared that a state law regulates insurance within the meaning of
§ 1144(b)(2)(A) if it (1) is "specifically directed toward entities engaged in
insurance," and (2) "substantially affect[s] the risk pooling arrangement between
the insurer and the insured." *Kentucky Ass'n of Health Plans v. Miller*, 538 U.S.
329, 342 (2003). MetLife does not dispute that Rule 590-218 satisfies *Miller*'s
first prong. We therefore turn to prong two.

At dispute in *Miller* was a Kentucky law requiring health insurers to accept
services from any health provider willing to meet the insurer's terms. *See id.* at
331–32. The Court held that the law was not preempted by ERISA because it
regulated insurance. *See id.* at 342. With respect to prong two, it said that a law
substantially affects risk pooling if it "alter[s] the scope of permissible bargains

---

[2](...continued)
or application of this rule which can be given effect without the invalid
provision or application, and to this end the provisions of this rule are
declared to be severable[.]

-13-

between insurers and insureds," *id.* at 338–39, and that the Kentucky law, by "expanding the number of providers from whom an insured may receive health services," altered the scope of permissible insurance bargains, *id.* at 338.

*Miller* reaffirmed the Court's earlier decisions holding that certain state insurance laws were not preempted by ERISA. In *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724 (1985), the Court upheld a mandated-benefit law obligating insurers to cover certain medical conditions, noting that the law "effectively forc[es] the good-risk individuals to become part of the risk pool," *id.* at 731. In *UNUM Life Insurance Co. of America v. Ward*, 526 U.S. 358, 364, 366–67 (1999), it held that ERISA did not preempt a state rule that prohibited insurers from denying coverage based on the insured's untimely notice unless the insurer showed actual prejudice from the delay. And in *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002), the Court upheld a state law that gave the insured the right to review by an independent physician of an insurer's denial of a covered service on the ground that it was not medically necessary. *See id.* at 361. Although these decisions had not applied the same reasoning as *Miller*, the *Miller* Court said that in each instance the state law regulated insurance because it "alter[ed] the scope of permissible bargains between insurers and insureds." 538 U.S. at 338–39; *see also id.* at 339 n.3 (explaining that the notice-prejudice rule upheld in *UNUM* "dictates to the insurance company the conditions under which it must pay for the risk that it has assumed," which "certainly qualifies as a

-14-

substantial effect on the risk pooling arrangement between the insurer and insured.").

In accordance with *Miller*, we hold that the application of Rule 590-218 to the Plan is expressly preempted by ERISA. The rule does not remove the option of insurer discretion from the scope of permissible insurance bargains in ERISA plans. It neither affects who gets in the risk pool nor prescribes the conditions under which insurers must pay for assumed risks. Rather, the rule authorizes discretion-granting clauses so long as they disclose certain matters and conform with the rule's font requirement. *See* Rule 590-218-5(3), (4). In short, Rule 590-218 relates to the form, not the substance, of ERISA plans; it has no impact on risk pooling and fails to satisfy *Miller* prong two.

If Rule 590-218 imposed a blanket prohibition on the use of discretion-granting clauses, we would have a different case. Two circuits have held that such a prohibition substantially affects risk pooling. They reasoned that by preventing insureds from accepting a discretion-granting clause in return for a lower premium, the prohibition narrows the scope of permissible insurance bargains. *See Standard Ins. Co. v. Morrison*, 584 F.3d 837, 840, 844–45 (9th Cir. 2009) (*Miller* prong two is satisfied by Montana's practice of disapproving all insurance forms containing discretion-granting clauses); *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 606–07 (6th Cir. 2009) (Michigan's prohibition on discretion-granting clauses satisfies *Miller* prong two because it limits the

contracts that insurers and insureds can enter into, preventing them from granting the insurer "unfettered discretionary authority"). But that reasoning does not apply here. Rule 590-218, although initially stating a prohibition, *see* Rule 590-218-2 ("prohibit[ing] the use of reservation of discretion clauses"), permits discretion-granting clauses in ERISA plans so long as they substantially conform to the rule's safe-harbor language and use bold, 12-point font, *see* Rule 590-218-5(3), (4). Indeed, the rule's title—"Permitted Language for Reservation of Discretion Clauses"—belies any notion that Rule 590-218 prohibits discretion.

Ms. Hancock contends that Rule 590-218 affects risk pooling because if a discretion-granting clause does not substantially conform to the rule's safe-harbor language, the clause is invalid, the insurer is deprived of discretion, and the resulting de novo review affects the risk pool by causing more reversals of benefit denials. Her argument proves too much. By her logic, any requirement, no matter how trivial (for example, a requirement that the plan be printed on mauve paper), affects risk pooling simply because an insurer's noncompliance would divest it of discretion, trigger de novo review, and change its risks. We decline to interpret *Miller* so broadly. The change in risk pooling must result from *compliance* with the state law, not its *violation*.

Ms. Hancock also contends that Rule 590-218 "puts a bridle" on insurer discretion, Reply Br. at 11, because it requires any discretion-granting clause to state that "the federal court will determine the level of discretion that it will

-16-

accord (the plan administrator's) determinations," Rule 590-218-5(3). We disagree. The quoted language must be read in conjunction with the previous paragraph, which states:

> The reservation of discretion made under this provision only establishes the scope of review that a federal court will apply when (a claimant) seeks judicial review of (the plan administrator's) determination of eligibility for benefits, the payment of benefits, or interpretation of the terms and conditions applicable to the benefit plan.

*Id.* By stating in this paragraph that the discretion-granting clause "establishes the scope of review [by] a federal court" while also acknowledging (in the language relied upon by Ms. Hancock) that the federal court has the final say regarding the extent to which it will defer, the rule is merely recognizing settled law with respect to the ultimate authority of the federal court. *See Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (describing judicial power to adjust the standard of review). The extent of judicial deference depends not only on whether discretionary authority is conferred by a plan, but also on the presence of conflicts of interest or failure to comply with procedural requirements. *See id.* ("[W]e dial back our deference if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." (emphasis and internal quotation marks omitted)); *Rasenack*, 585 F.3d at 1316 ("[W]hen an administrator violates the statutory deadlines incorporated into the plan, *Firestone* deference no longer applies."). Thus, the language

-17-

quoted by Ms. Hancock serves only an informational purpose, advising claimants of the scope of federal-court authority even when the plan has a discretion-granting clause.

At oral argument, counsel for Ms. Hancock raised two arguments not presented in her briefs on appeal. Although we could reject them both on procedural grounds, *see Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1235 n.8 (10th Cir. 2009) ("An argument made for the first time at oral argument . . . will not be considered."); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1202 n.2 (10th Cir. 2003) (failure to brief issues, even those raised in district court, permits an appellate court to decline review), we can readily dispose of them on the merits and elect to do so.

First, counsel asserted at oral argument that Rule 590-218 permits insurers to restrict only the scope of review, not the standard of review. Although conceding that the terms *scope of review* and *standard of review* are sometimes used loosely, counsel asserted that "[s]cope of review talks about what material a trial or appellate court can review in evaluating whether the decision was correct," whereas "standard of review is looking at the degree to which you look at it from a de novo perspective, or the deference that you give." Because the safe-harbor language of Rule 590-218 uses the term *scope of review*, argued counsel, the Plan could restrict only what materials a court could consider in reviewing MetLife decisions. If this argument is valid, the rule prohibits clauses

providing for judicial abuse-of-discretion review, thereby affecting risk-pooling and surviving ERISA preemption. The argument, however, is unpersuasive. It would require us to adopt a nonsensical interpretation of the rule. The rule's safe-harbor language states that the decisionmaker has discretion to decide whether the claimant is eligible for benefits and "to interpret the terms and conditions of the benefit plan." Rule 590-218-5(3) (internal quotation marks omitted). Granting discretion to the decisionmaker would have no practical effect if a reviewing court did not have to give some measure of deference to the decisions made. To give an insurer discretion is to uphold its decision even at times when it appears to be incorrect. Further, nothing in the rule addresses what materials can be reviewed by courts. Thus, the term *scope of review* in the safe-harbor language must be referencing the extent to which a court defers to the decisionmaker, not the materials that a court can consider. *See* Rule 590-218-5(3) ("The reservation of discretion made under this provision only establishes the *scope of review* that a federal court will apply when (a claimant) seeks judicial review of (the plan administrator's) determination of eligibility for benefits, the payment of benefits, or interpretation of the terms and conditions applicable to the benefit plan." (internal quotation marks omitted) (emphasis added)). Perhaps the rule would have been clearer if it used the term *standard of review* rather than *scope of review*. But Ms. Hancock has not persuaded us that the phrase *scope of*

*review* is a term of art with such a settled meaning that we should ignore the clear import of the rule.

The second unbriefed contention raised at oral argument was that Rule 590-218's safe harbor is available only if the insurance company is the plan administrator. Counsel drew that inference from the safe-harbor provision's use of the term *the plan administrator* in the parentheticals where the name of the insurer would appear in a plan. Noting that being a plan administrator triggers significant responsibilities under ERISA, counsel suggested that the rule intended to permit discretion only to insurers that assumed such responsibilities. This restriction on which insurers could be permitted deference, concluded counsel, is a substantive constraint that affects risk pooling, so the rule regulates insurance and is not preempted by ERISA. We reject the argument because Rule 590-218 does not require the insurance company to be the plan administrator. The rule's definition of *reservation of discretion clause* encompasses clauses reserving discretion to "the plan administrator" or to "the insurance company acting in the capacity of a plan administrator in an employee benefit plan." Rule 590-218-4(5). The second alternative is superfluous if the insurance company must actually *be* the plan administrator; and we generally avoid construing a law in a manner that renders clauses, or even words, superfluous. *See FTC v. Accusearch Inc.*, 570 F.3d 1187, 1198 (10th Cir. 2009). Also, nowhere does the rule explicitly state that deference is available only to insurers who are plan administrators. We can

hardly infer such a requirement from the rule's use of the term *plan administrator* as a mere place holder in its safe-harbor language.

Because Rule 590-218 has no substantial effect on risk pooling, we hold that it is not saved from ERISA preemption as a state law regulating insurance. The Utah rule is therefore preempted by 29 U.S.C. § 1144(a), and MetLife's discretion-granting clause is valid.

### 2. MetLife's Review Procedure

Although we ordinarily apply arbitrary-and-capricious review when an ERISA benefit plan gives discretion to the administrator or fiduciary to determine benefit claims, *see Kellogg*, 549 F.3d at 825, de novo review may be appropriate if the benefit-determination process did not substantially comply with ERISA regulations, *see id.* at 827–28.[3]

Ms. Hancock contends that MetLife's determination of her claim was so procedurally defective as to warrant de novo review. In particular, she alleges (1) that MetLife's denial letters did not include information required by ERISA regulations, and (2) that MetLife did not provide a full and fair review of her appeal. We reject both contentions.

---

[3]Because Ms. Hancock has failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA. *See Kellogg*, 549 F.3d at 828.

## a. MetLife's Denial Letters

ERISA regulations require benefit-denial notifications to set forth, among other things, the specific plan provision justifying the denial as well as a description of additional information needed to perfect the claim and why the information is necessary. *See* 29 C.F.R. § 2560.503-1(g)(1)(ii), (iii). Ms. Hancock complains that MetLife's benefit-denial letter and its first appeal-denial letter violated this regulation by not citing the Plan provision upon which the denial was based and not explaining how she could perfect her claim.

MetLife received Ms. Hancock's claim on January 20, 2005. In its March 22, 2005, denial letter MetLife explained that because both Verla Hancock's death certificate and autopsy report state that the cause of death is undetermined, "accidental death has not been established" and therefore Ms. Hancock is not entitled to AD&D benefits. Admin. R. at 176. The letter quoted the Plan's AD&D provision, including language that limits coverage to accidental losses. It informed Ms. Hancock of her right to appeal to MetLife, and asked her to state "the reason(s) you believe the claim was improperly denied, and submit any additional comments, documents, records or other information relating to your claim that you deem appropriate to enable MetLife to give your appeal proper consideration." *Id.* at 176–77.

On May 19, 2005, Ms. Hancock sent MetLife a letter appealing the denial of AD&D benefits. The letter argued that the autopsy report and death certificate

-22-

did not preclude the possibility of accidental death and that "[o]ther evidence exists . . . to support the conclusion that my mother's death was indeed an accident." *Id*. at 173. It said that she had spoken with Detective Frank Johnson of the West Valley City Police, who had investigated Verla Hancock's death, and that he had told her that her mother had apparently hit her head after slipping and falling in the bathroom. The letter further stated that Dr. Todd Grey, who had conducted the autopsy, had agreed that it was possible for Verla Hancock to have slipped and hit her head without fracturing her skull, and that decomposition could have made it hard to detect a head injury. In addition, the letter included Ms. Hancock's offer to send police photographs of the scene as additional evidence that "would be helpful in further establishing the accidental nature of my mother's death." *Id.* MetLife denied Ms. Hancock's appeal on September 1, 2005.

Neither MetLife's benefit-denial letter nor its appeal-denial letter violated § 2560.503-1(g). First, the benefit-denial letter set forth the Plan provision justifying the denial. It stated that the claim was denied for lack of evidence of accidental death, and properly cited the AD&D language that limits coverage to such losses. Ms. Hancock argues that the denial was based on an exclusion in the Plan for death caused by physical illness; but the record shows that MetLife did not rely on that provision. Second, the denial letter described what information was needed to perfect the claim and why that information was needed. It

-23-

explained that to obtain AD&D benefits, Ms. Hancock must supply evidence of accidental death as required by the AD&D provision. Her own appeal letter indicates that she had understood what she had to do to contest MetLife's decision. We discern no procedural violation in MetLife's benefit-denial letter.

As for MetLife's appeal-denial letter, it could not have violated § 2560.503-1(g) because that provision applies only to denials of benefits, not denials of appeals. *See Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1168 n.4 (10th Cir. 2007) (citing § 2560.503-1(g) to describe a plan administrator's duties in the initial denial, and citing § 2560.503-1(h) to describe its duties in the appeals process); *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 237 (4th Cir. 1997) ("What is not required [to be included in the decision on appeal], because not relevant at this stage of the administrative review, is notice regarding how to perfect a claim or how to seek review."); *cf. Midgett v. Washington Group Int'l Long Term Disability Plan*, 561 F.3d 887, 894–95 (8th Cir. 2009) (explaining that the "adverse benefit determination" is the initial benefit denial, which is to be distinguished from the determination "on review." (emphases and internal quotation marks omitted)).

### b. Full and Fair Review

Ms. Hancock contends that MetLife denied her full and fair review because it (1) ignored her evidence, (2) did not respond to her forensic expert's opinion in a timely manner, and (3) failed to conduct an independent investigation of Verla

Hancock's death, instead "[relying] solely on the government reports."  Aplt. Br. at 21.  Her contentions lack merit.

Every ERISA benefit plan must have a procedure giving claimants "a reasonable opportunity to appeal . . . and under which there will be a full and fair review of the claim and the adverse benefit determination."  29 C.F.R. § 2560.503-1(h)(1).  Full and fair reviews must "take[] into account all comments, documents, records, and other information submitted by the claimant." *Id.* § 2560.503-1(h)(2)(iv).  Moreover, absent special circumstances, decisions must be rendered within 60 days of receipt of the appeal.  *Id.* § 2560.503-1(i)(1)(i).

In its first appeal-denial letter dated September 1, MetLife rejected Ms. Hancock's conversations with Detective Johnson and the medical examiner as evidence of accidental death.  It said that Johnson had deferred to the medical examiner, Dr. Grey, on cause of death, and that Dr. Grey had merely speculated with Ms. Hancock and had never amended his report regarding the cause of death. Their comments, it continued, were conjecture.

By letter dated February 6, 2006, Ms. Hancock appealed again.  This time she submitted an investigative report prepared by MRA Forensic Sciences.  MRA had conducted a slip-meter test on tiles similar to those in Verla Hancock's bathroom and found that they were slippery when wet.  MRA listed factors that made a slip-and-fall accident likely, including Verla Hancock's medical problems,

history of falls, and a potentially wet floor (although it provided no evidence that the tiles were wet at the time of death). The report then stated: "[I]t cannot be concluded that [Verla Hancock] did not die of accidental causes. In fact, based upon the available information, there was sufficient evidence to suggest that she was prone to falling down and that she probably did fall down in the bathroom." Admin. R. at 166. Ms. Hancock's letter stated that the enclosed documents were submitted on condition that they not be used in any future litigation.

MetLife received Ms. Hancock's letter on February 13, 2006. Ten days later it informed her that it would be "willing to conduct a further administrative review," *id.* at 142, provided that she agree that her submissions be part of the administrative record that could be reviewed by a court. On March 3 Ms. Hancock agreed and asked MetLife to proceed with its review.

More than three months passed with no decision from MetLife. On June 27, 2006, Ms. Hancock's attorney wrote to MetLife, noting that he had contacted MetLife over 20 times in the previous months and was always told only that "the claim is in the review process," without additional explanation. *Id.* at 134. The letter threatened suit for breach of contract if Metlife did not pay the disputed AD&D benefits within ten days. On September 12 Ms. Hancock, still without a decision on her appeal, filed suit.

MetLife denied Ms. Hancock's second appeal the next day. The denial letter stated that it only supplemented the first appeal-denial letter and did not

replace it.  It again cited the Plan's AD&D provision and summarized MetLife's reasons for denying the claim and the first appeal.  It then stated that the MRA report "d[id] not demonstrate with certainty that the decedent had an accident" and that the slip-meter test said nothing about Verla Hancock's actual cause of death.  *Id.* at 132.

From this correspondence we cannot conclude that MetLife denied Ms. Hancock a full and fair review.  MetLife did not ignore her evidence; it merely found it inconclusive.  Both appeal-denial letters took into account the information Ms. Hancock had submitted and then reasonably explained why the information was insufficient to support the accidental-death theory.

Moreover, MetLife had no duty to respond to the MRA report within a particular time.  ERISA requires only that claimants be given "*a* reasonable opportunity to appeal."  29 C.F.R.  § 2560.503-1(h)(1) (emphasis added).  MetLife satisfied this requirement when it reviewed Ms. Hancock's first appeal.  ERISA does not demand, and the Plan does not provide for, a second opportunity to appeal.  That MetLife nevertheless considered her second appeal did not bring its response to that appeal under ERISA's regulations governing appeals.  Because Ms. Hancock submitted the MRA report with her *second* appeal, MetLife's delay in responding to it was not a procedural defect under ERISA.

Finally, Ms. Hancock contends that MetLife's failure to conduct an independent investigation denied her the required full and fair review.  We

-27-

disagree. Ms. Hancock's argument for such an investigation is particularly unpersuasive here, because her mother's death had been properly investigated by police detectives and a medical examiner—disinterested third parties with recognized credentials.

### 3.     Conflict of Interest

Ms. Hancock contends that because MetLife has a "serious and inherent" conflict of interest, Aplt. Br. at 20, it bears the burden of proving that its denial was reasonable. MetLife concedes that as both claim administrator and insurer, it has a conflict of interest. The effect of that conflict, however, is not to place the burden of persuasion on MetLife.

Ordinarily, we review discretionary benefit decisions under an arbitrary-and-capricious standard. *See Kellogg*, 549 F.3d at 825. But if the plan administrator or fiduciary operates under a conflict of interest, we decrease our deference in proportion to the seriousness of the conflict. *See Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1004 (10th Cir. 2004) (per curiam). At one time we distinguished between standard conflicts and inherent conflicts to determine how much deference to withhold. If the conflict was standard—that is, if the fiduciary's or administrator's "dual role jeopardized [its] impartiality," *id.* at 1005 (internal quotation marks omitted)—and the claimant could not establish that the conflict was serious, we considered the conflict as one factor in determining whether the benefit denial was arbitrary and capricious, *see id.* But

-28-

if the conflict was inherent—for example, if the administrator of the plan was also its insurer—the burden shifted to the conflicted party to prove that its decision was not arbitrary and capricious. *See id.* at 1006.

The Supreme Court, however, has recently rejected burden-shifting rules. *See Metro. Life. Ins. Co. v. Glenn,* 128 S.Ct. 2343, 2351 (2008) ("Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules . . . . In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account."). Following *Glenn*, we now weigh all conflicts of interest—be they standard or inherent—as a factor in our review. *See Holcomb v. UNUM Life Ins. Co. of Am.*, 578 F.3d 1187, 1192–93 (10th Cir. 2009). In our analysis, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn*, 128 S.Ct. at 2351. That is, a conflict of interest affects the outcome at the margin, when we waver between affirmance and reversal. A conflict is more important when "circumstances suggest a higher likelihood that it affected the benefits decision," but less so when the conflicted party "has taken active steps to reduce potential bias and to promote accuracy." *Id.* With this in mind, we proceed to evaluate MetLife's decision under arbitrary-and-capricious review.

**B.    MetLife's Benefit Denial**

Having determined the proper standard of review, we turn to the second issue before us: whether MetLife's denial of Ms. Hancock's AD&D claim was arbitrary and capricious. "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002). To survive our review, MetLife's decision "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis." *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) (internal quotation marks omitted).

As the claimant, Ms. Hancock bore the burden of proving the occurrence of a covered loss. *See McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992). The Plan's AD&D provision covers losses when an "accident is the sole cause of the injury . . . and that injury is the sole cause" of the loss. Admin. R. at 40. To obtain benefit payment, claimants must notify MetLife and provide "satisfactory proof of that loss." *Id.* at 43. Here, MetLife reasonably decided that Ms. Hancock failed to prove accidental death.

MetLife's denials of Ms. Hancock's claim and appeals relied on Verla Hancock's death certificate and autopsy report. The autopsy found "[n]o

evidence of natural disease, injury or intoxication sufficient to explain death." *Id.* at 217. The report noted that Verla Hancock had a history of prescription-drug abuse and that "findings at the scene of death were highly suggestive of death due to an overdose of Oxycontin"; but it added that "toxicologic testing reveals no evidence of excessive amounts of Oxycontin or other intoxicants." *Id.* It concluded that Verla Hancock "died as a result of undetermined causes." *Id.*

Ms. Hancock's theory is that her mother slipped in the bathroom and died when she hit her head on the toilet. According to her first appeal letter, Detective Johnson, who had investigated Verla Hancock's death, said that "it looked like [Verla Hancock] slipped, fell, and hit her head," *id.* at 174, and Dr. Grey, the medical examiner, agreed that Ms. Hancock's theory was possible. On her second appeal Ms. Hancock submitted MRA's investigative report as additional evidence of accidental death. MRA found that Verla Hancock's bathroom floor would be slippery when wet. The report described other facts that "strongly suggest that [Verla] Hancock had fallen down in the bathroom." *Id.* at 165. For example, in the six months before her death, Verla Hancock had fallen 12 times, including once approximately six days before her body was discovered, when she fell and hit her head on the clothes dryer. She had suffered from neuropathy resulting in foot drop, had problems with depth perception, and complained of dizziness—all of which increased the likelihood of a fall. And the position of her body and the overturned chair were consistent with a slip and fall. But the report also noted

-31-

that she had had obstructive sleep apnea, which could have stopped her breathing once she became unconscious. Significantly, MRA did not affirmatively conclude that death had been accidental, only that "a conclusion that [Verla] Hancock's death appears to be related to an accidental fall appears to be reasonable." *Id.* at 167.

MetLife rejected Ms. Hancock's submissions as unsatisfactory evidence of accidental death. It acknowledged her conversations with Johnson and Dr. Grey. But, MetLife explained, speculation about possibilities "[does] not establish that an accident caused the decedent's death." *Id.* at 169. It pointed out that regardless of what Dr. Grey had told Ms. Hancock, he did not amend his official conclusion as to the cause of death. Likewise, MetLife found MRA's report devoid of evidence of an underlying accident. The report, MetLife said, only hypothesizes that Verla Hancock probably slipped, without establishing what had actually happened.

Based on the government's reports and Ms. Hancock's submissions, MetLife reasonably concluded that she had not proved that her mother's death was accidental. To be sure, circumstantial evidence indicates that accidental death is a possibility. But the autopsy failed to find sufficient evidence to establish any cause of death, be it accidental or otherwise. We think it significant that MetLife relied on the government's investigations and conclusions to deny Ms. Hancock's claim. Such reliance reduces potential bias arising from

MetLife's conflict of interest and shows that its decision was grounded on a reasonable basis. We therefore cannot conclude that MetLife's denial of Ms. Hancock's AD&D claim was arbitrary or capricious.

## III.   CONCLUSION

We AFFIRM the judgment below.