[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15900
Non-Argument Calendar

_____

D.C. Docket No. 1:15-cv-00628-WSD

STEVEN D. PRELUTSKY,

Plaintiff-Appellee,

versus

GREATER GEORGIA LIFE INSURANCE COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 2, 2017)

Before MARTIN, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Greater Georgia Life Insurance Company ("GGL") appeals the district court's grant of summary judgment to Steven Prelutsky on Prelutsky's claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., that GGL wrongfully denied him benefits.  After careful review, we reverse.

I.

Steven Prelutsky was a partner at the law firm Hall, Booth, Smith, PC and participated in the firm's long-term disability benefits plan ("the Plan").  The Plan is provided through a group insurance policy insured by GGL.  GGL serves as both the Plan's administrator of claims and the payor of benefits.  The Plan vests GGL with discretionary authority to interpret the Plan's terms and determine whether a claim should be paid.  The Plan excludes from coverage any disability "caused by, resulting from, or related to" intoxication ("the Intoxication Exclusion").  The Plan's Intoxication Exclusion says:

> The Policy does not cover any disabilities or loss caused by, resulting from, or related to any of the following . . .
>
> Any accident, Injury or Illness caused by, resulting from, or related to Your being under the voluntary influence of any drug, narcotic, intoxicant or chemical, unless administered by or taken according to the advice of a Physician.

In March 2014, while on a ski vacation in Aspen, Colorado, Prelutsky fell down a flight of twenty stairs in the home where he was staying.  There were no

2

witnesses to the fall.  At some point after the fall, Prelutsky's son found him.[1]

When paramedics arrived, Prelutsky did not have a pulse.  They performed CPR

and then took him to the hospital.  Prelutsky was admitted to Aspen Valley

Hospital at 9:33 p.m., where he was then intubated and diagnosed with bilateral

subdural hematomas associated with a midline shift and skull fracture.

At 9:51 p.m., a blood-alcohol test was performed. The test showed

Prelutsky's blood-alcohol level was 281 mg/dL.[2]  The following day, Prelutsky

was transferred to St. Mary's Hospital in Grand Junction, Colorado, where a

craniectomy was performed.  In April 2014, Prelutsky was transferred to a long-

term rehabilitation facility.  Nine months after his injury, Prelutsky's condition had

improved but he was still unable to return to work due to continuing cognitive

deficits and word-finding problems.

In June 2014, Prelutsky applied to GGL for long-term disability benefits.  To

conduct its initial review of Prelutsky's claim, GGL obtained his medical records

from the rehabilitation facility.  A report by attending physician Dr. Brock

---

[1] The record does not show how much time passed between when Prelutsky fell and when his son found him.

[2] A level of 281 mg/dL equals a blood-alcohol concentration ("BAC") of .281%.  For comparison, a BAC of .08% is the legal driving limit in every state.  See Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1193 n.3 (11th Cir. 2010).

The toxicology report contained a disclaimer that said: "These unconfirmed 'screening' results are to be used for medical purposes only.  They are not intended for non-medical purposes (e.g. employment and/or legal testing)."  However, Prelutsky does not challenge the accuracy or reliability of the hospital's determination that his BAC was .281% on the night of the fall, and therefore we do not question it.

3

Bowman listed as one of the "admitting diagnoses": "alcohol abuse (binge drinking) with a blood alcohol of 0.250 at the time of his fall."[3]  Dr. Bowman also noted that Prelutsky had a history of "binge drink[ing] approximately 2-3 times per week" and that his "[l]ast alcohol intake would have been at the time of the accident."  In addition, a physical therapy discharge note by attending physician Dr. Payal M. Fadia said: "Alcohol abuse reported with a blood alcohol level of 0.25 at the time of his fall."  In July 2014, GGL denied Prelutsky's claim, citing the Intoxication Exclusion and the fact that Prelutsky's "blood alcohol level was 0.25 when tested at the hospital" after the fall.  Prelutsky appealed the denial, arguing that GGL failed to properly investigate his claim.

Before deciding Prelutsky's appeal, GGL compiled a more comprehensive record, including many documents submitted by Prelutsky.  In addition to the records from the rehabilitation facility, GGL obtained: Prelutsky's medical records from the two hospitals where he was treated; a report from an independent physician, Dr. Richard E. Sall; an affidavit from Cynthia Cameron, the owner of the home where Prelutsky was staying when he fell; and pictures of the stairs as they looked on the day of the accident.

The medical records from Aspen Valley Hospital contained the blood-alcohol test showing Prelutsky's blood alcohol was 281 mg/dL on the night of the

---

[3] We've been offered no explanation for why some medical records listed Prelutsky's BAC as .25% when the toxicology report showed a BAC of .281%.

fall.  The Aspen Valley records also included a report from consulting surgeon Dr. William Rodman, which listed as one of Prelutsky's diagnoses: "Intoxication (blood alcohol 253)."  The records from St. Mary's Hospital, prepared the day after the fall, stated that "[t]he patient[']s BAL was 250 on admission," and listed "alcohol intoxication" among the final diagnoses.  The consultation notes from another physician, Dr. David James, listed "[a]cute alcohol intoxication" as one of Prelutsky's diagnoses, and indicated that the hospital should commence its alcohol withdrawal protocol.  A document titled "History and Physical Notes" said: "Patient . . . is 53 year old attorney skiing in Aspen on family vacation.  Had drank heavily this evening; fall 20 carpeted steps with immediate LOC [loss of consciousness]."

As part of its review of Prelutsky's appeal, GGL forwarded his medical records to an independent physician, Dr. Richard E. Sall, who is board-certified in forensic medicine.  GGL asked Dr. Sall to assess whether Prelutsky's "blood alcohol level contribute[d] to his fall or were any other contributing factors identified."  Dr. Sall determined that:

> [I]n my medical opinion, the claimant's BAC contributed to his fall. . . . The claimant had a blood alcohol level of .281%.  Since at 0.25% BAC, the individual would need assistance in walking and have impaired coordination, it would contribute to his fall down the stairs.

5

Dr. Sall concluded: "Considering all the facts and circumstances in this case, it is my medical opinion that the claimant was Intoxicated at the time of admission to the hospital and the level of intoxication most probably contributed to the cause for falling down the steps."

In support of his appeal, Prelutsky produced an affidavit from Cynthia Cameron, the owner of the home where Prelutsky fell. Cameron saw Prelutsky for two "brief period[s] of time" on the night of the accident, though it is unclear how much time passed between when she saw him and when he fell. Cameron said Prelutsky did not "appear to be overtly intoxicated" and "was not stumbling or falling down" when she saw him. She also said "[i]t is [her] personal belief that [Prelutsky] probably slipped on his ski pants" because, when she saw him, he was still wearing his ski pants, which were "longer than normal, designed to fit over ski boots." Cameron was not with Prelutsky when he fell and had no first-hand observations of the accident.

In January 2015, GGL upheld its denial of Prelutsky's claim for long-term disability benefits. Like the initial denial, GGL said Prelutsky's disability was not covered by the Plan because his disability fell under the Intoxication Exclusion. Prelutsky then filed this ERISA action challenging GGL's denial of his claim.

The parties filed cross motions for summary judgment.[4] In its summary judgment decision, the district court first considered whether Prelutsky was "under the voluntary influence of an intoxicant, in this case alcohol, when he was injured." The district court reviewed the evidence of intoxication and found that Prelutsky "was intoxicated at the time of his fall." The court then considered whether Prelutsky's injury was "caused by, resulted from, or was related to his being intoxicated." On de novo review (the first step of the ERISA analysis), the district court found that the evidence did not support "a causal link" between Prelutsky's intoxication and his fall, and thus found GGL's benefits-denial decision was "wrong." The court then proceeded to the next step of the ERISA analysis: whether GGL's decision to deny benefits was supported by "reasonable grounds." The court found that because GGL's decision was based on "insufficient investigation," its decision to deny benefits was not supported by reasonable grounds. As a result, the district court granted summary judgment in favor of Prelutsky. GGL appealed.

II.

---

[4] GGL called its motion a "Motion for Judgment on the Administrative Record." As we have recognized, the motion that serves "as [a] vehicle[] for resolving conclusively" an ERISA benefits-denial action is not a typical motion for summary judgment. See Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 n.4 (11th Cir. 2011) (per curiam). Unlike the usual summary-judgment standard, the district court in the ERISA context "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 17–18 (1st Cir. 2002). Thus, GGL properly named its final dispositive motion a "Motion for Judgment on the Administrative Record."

We review de novo a district court's ruling on a plan administrator's decision to deny benefits, applying the same legal standards that governed the district court's decision. Blankenship, 644 F.3d at 1354. "Review of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." Id. Where a plan administrator has denied a claim because of a policy exclusion, as GGL did here, the burden is on the administrator to show that the "exclusion prevents coverage." Horton v. Reliance Std. Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998) (per curiam). We use a six-step test to review a plan administrator's denial of benefits:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

8

Blankenship, 644 F.3d at 1355.

Here, it is undisputed that GGL was vested with discretion in reviewing claims under the Plan.  Therefore, even assuming that GGL's decision was "de novo wrong," as the district court found, the dispositive question is whether GGL's decision was arbitrary and capricious.  See Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989).  Thus, we will begin our analysis at step three and determine whether GGL's decision to deny Prelutsky's claim was arbitrary and capricious.  "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard . . ., the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."[5]  Id.

The district court found that Prelutsky was intoxicated at the time of his fall, and Prelutsky does not challenge that finding on appeal.  However, in order for the Intoxication Exclusion to apply, it is not enough merely to show that Prelutsky was intoxicated at the time of his injury.  Rather, Prelutsky's injury must have been "caused by, resulting from, or related to" his intoxication.  Because GGL had a

---

[5] We "equate the arbitrary and capricious standard with the abuse of discretion standard." Doyle v. Liberty Life Assur. Co. of Bos., 542 F.3d 1352, 1356 n.1 (11th Cir. 2008).  Under this standard, deference is "due both for the administrator's plan interpretations and for [its] factual determinations."  Blankenship, 644 F.3d at 1355 n.6.

reasonable basis to conclude that Prelutsky's injury was, at a minimum, "related to" his intoxication, its denial of benefits was not an abuse of discretion.[6]

GGL reviewed the complete medical-record history of Prelutsky's brain injury. The records contained undisputed toxicological evidence that, at the time Prelutsky fell, his BAC was .281%—which the physicians who treated Prelutsky diagnosed as "[a]cute alcohol intoxication." The records describing his fall also specifically mentioned that Prelutsky "[h]ad drank heavily this evening." While the treating physicians never expressly determined that Prelutsky's intoxication was the cause of his fall, the fact that they said he "[h]ad drank heavily this evening" directly before noting that he "f[e]ll 20 carpeted steps" indicates that the doctors believed Prelutsky's intoxication was an important aspect of the circumstances of his fall and provided important context for understanding the nature of his fall.

GGL then submitted Prelutsky's medical records for review by Dr. Sall, an independent forensic physician. Dr. Sall confirmed that Prelutsky's intoxication likely played a causal role in his fall. He explained that a person with Prelutsky's level of intoxication "needs assistance in walking" and "experiences total mental confusion," "slurred speech, incoordination, unsteady gait, . . . and stupor."

---

[6] "Related" is defined as "[c]onnected in some way; having relationship to or with something else." Black's Law Dictionary 1479 (10th ed. 2014).

Moreover, Dr. Sall's ultimate conclusion was that Prelutsky's "intoxication most probably contributed to the cause for falling down the steps."  GGL was entitled to rely on these expert findings to determine that Prelutsky's injury was "related to" his intoxication.  See Turner v. Delta Family-Care Disability & Survivorship Plan, 291 F.3d 1270, 1274 (11th Cir. 2002) (per curiam) (holding that plan administrator is "entitled to rely on the opinion of the independent medical examiner").  The causal link between Prelutsky's intoxication and his injury is especially strong because his medical records show that, aside from the extreme intoxication, he was a perfectly healthy middle-aged man, who was "[i]ndependent in all ways" and had no condition that would make him prone to fall.

The fact that Prelutsky submitted an affidavit from Cameron, who believed Prelutsky "probably slipped on his ski pants," does not render GGL's conclusion unreasonable.  Cameron did not witness the fall.  Neither did she indicate how much time passed between when she last saw Prelutsky and when he fell.  In light of these limitations, GGL was entitled to discount Cameron's "personal belief" about what caused Prelutsky's fall.  We have held that a plan administrator is permitted to rely on medical evidence over a conflicting witness account, even when that account comes from a reliable eyewitness to the accident.  See Capone, 592 F.3d at 1194, 1200.  Certainly, GGL was entitled to rely on expert medical evidence over an affidavit from someone who had not witnessed the accident.  See

11

Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1572 (11th Cir. 1990) ("[A] fiduciary is entitled to choose an apparently more reliable source of information when sources conflict."). But even assuming that Prelutsky did trip on his ski pants, it is not unreasonable to infer that Prelutsky's highly-intoxicated state was still "related to" his injury, because the symptoms of extreme intoxication could have prevented him from catching himself, or covering his head, or mitigating the impact of his fall in some other way.

The district court said our decision in Capone required a finding that GGL's investigation was not sufficient "to reasonably find a causal link between [Prelutsky's] alcohol consumption and his fall." The district court read Capone to hold that the "causal link" between alcohol intoxication and injury must be "supplemented by a further investigation by the insurer" if all the insurer has is a "blood test and a list of physical symptoms expected at a certain blood alcohol level." But this was not the holding of Capone.[7]

The plaintiff in Capone was severely injured when he struck his head on the bottom of the ocean while diving off a dock in the Bahamas. 592 F.3d at 1192–93. A test revealed he had a BAC of .244%. Id. at 1192–93. Relying solely on this BAC and a medical treatise's generic description that a person with such a BAC would be "grossly impaired," id. at 1194, the insurance company decided there was

---

[7] Even accepting the district court's reading of Capone, it would not govern here. GGL's evidence was not limited to a "blood test and a list of physical symptoms."

a causal connection between the plaintiff's intoxication and his "decision to dive." Id. at 1200 (emphasis added). The insurance company made this determination even though it knew the plaintiff was accompanied by other people who (1) also decided to dive but had not consumed any alcohol, and (2) saw "the series of events leading up to the [plaintiff's] dive." Id. The insurance company made no attempt to interview these witnesses before it denied the plaintiff's claim for benefits. Id. 1199–1200. In other words, the company failed to investigate witnesses who may well have directly contradicted the company's theory of the causal connection between the plaintiff's intoxication and his injury. Reviewing those facts, we concluded the company's investigation was unreasonable. Id. at 1200.

The situation here is very different from Capone. Unlike in Capone, there were no witnesses to Prelutsky's fall or to the "series of events leading up to" it. Id. Thus, there were no other sources of direct evidence GGL could have investigated that were likely to disprove what the evidence already showed: Prelutsky's extremely high level of intoxication was causally connected in some way to his fall and subsequent injury. As a result, GGL's determination that Prelutsky's claim was barred by the Intoxication Exclusion was supported by reasonable grounds. See Blankenship, 644 F.3d at 1355.

13

Because we find there were reasonable grounds for GGL's decision, we must consider whether any conflict of interest renders GGL's decision arbitrary and capricious. Id. Here, the only conflict is the "structural" conflict of interest that is always present when a plan administrator "both makes eligibility decisions and pays awarded benefits out of its own funds." Id. "The presence of a structural conflict of interest—an unremarkable fact in today's marketplace—constitutes no license, in itself, for a court" to overturn an otherwise reasonable benefits decision. Id. at 1356. Prelutsky has not shown that GGL's conflict was anything other than standard industry practice. Neither has he shown that GGL's decision was in any way "tainted by self-interest." See id. at 1355 ("Where a conflict exists . . . the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." (quotation omitted)). Indeed, it was only after an independent forensic physician reviewed Prelutsky's medical records and issued his report finding a causal link between Prelutsky's intoxication and his injury that GGL upheld its initial denial. Therefore, we cannot say that GGL's conflict of interest made its decision arbitrary and capricious.

**REVERSED.**