WILLIAM M. RAY, II, United States District Judge
This matter is before the Court on Plaintiff Felicia Lann's Motion for Summary Judgment [Doc. 19] and Defendant Metropolitan Life Insurance Company's Motion for Judgment on the Administrative Record. [Doc. 21]. After consideration of both motions, the Parties' respective responses and replies, all matters of record and the Parties' oral arguments before this Court on February 13, 2019, the Court enters the following ORDER.
I. BACKGROUND
The facts of the case, which are taken from the Administrative Record (AR), are undisputed. On April 13, 2016, Dormekeal Lann (Decedent), husband of Plaintiff, died as a result of a gunshot wound to the head. [AR45-46]. At the time of his death, the Decedent was an employee of Intercontinental Exchange, Inc. ("I.E.") [AR92] and a participant in I.E.'s Health and Welfare Benefits Plan (the Plan) [AR19], which is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. § 1001, et seq. The Plan was funded by Group Policy No. 158248-1-G issued by Defendant to I.E. [AR377-477].
A. Facts of the Case
The Decedent enrolled in basic life insurance, supplemental life insurance, and AD & D insurance coverage. [AR19]. Plaintiff, the Decedent's surviving spouse and beneficiary, submitted claims for basic life, supplemental life, and AD & D benefits under the Plan. [AR43-109]. Defendant approved and paid Plaintiff's claim for basic life benefits, but denied her claims for supplemental life and AD & D benefits because, among other reasons, the Gwinnett County Medical Examiner determined, *1188 after an autopsy, that the Decedent committed suicide. Plaintiff disputed these findings and submitted an administrative appeal of the denial. [AR12-13].
The official death certificate was completed by Carol A. Terry, MD, ME, Gwinnett County Medical Examiner, who confirmed the Decedent's date of death as April 13, 2016, and the "immediate cause of death" as "contact gunshot wound of head, delayed effects." [AR45]. Under the heading "describe how injury occurred," Dr. Terry stated: "shot self with handgun," and under "accident, suicide, homicide, undetermined (specify)" Dr. Terry wrote: "suicide." [Id.].
The Medical Examiner's Report contained an Investigative Report completed by the Medical Examiner's Investigator, Robert Bumgardner, and an autopsy report completed by Dr. Terry. [AR51-59]. Mr. Bumgardner's report stated that he interviewed Plaintiff via telephone on April 14, 2016, and recorded the following:
Mrs. Lann said the decedent was cleaning his gun the evening of April 13, 2016, at the kitchen table. Mrs Lann said that the decedent inserted the ammunition clip in the gun several times while walking to the bathroom down a hallway of the residence. Mrs. Lann said she heard the gunshot go off and found the decedent partially in the bathroom and partially in the hallway. Mrs. Lann stated that the projectile struck the bathroom wall and was a few inches shorter than the height of the decedent. Mrs. Lann said there were no domestic problems in the marriage. Mrs. Lann said there had been no fighting the night of the incident. Mrs. Lann stated that the decedent had consumed an alcoholic beverage before the incident. Mrs. Lann said that the decedent was in the Air Force in the past and was somewhat familiar with handguns.
(Mr. Bumgardner opined that "the decedent died as a result of a self inflicted gunshot wound to the head," but deferred to the Medical Examiner for determination of the "cause and manner of death." [AR53].
Dr. Terry's autopsy report noted a "[c]ontact-range entrance wound of [the] right temple with associated soot deposition," and that the "[w]ound path is right-to-left and minimally front-to-back, perforating [the] head." [AR58]. Dr. Terry identified the "cause of death" as "contact gunshot wound of head, delayed effects," and the "manner of death" as "suicide." [AR59]. She also rendered the following opinion based on the autopsy:
This 39-year-old black male, Dormekeal Kormel Lann, died as a result of a gunshot wound of the head. The range of fire was contact. Since the firearm was pressed against the subject's head at the time that it was discharged, this action is considered to be innately self destructive, therefore, the manner of death is certified as 'suicide.' [Id.].
Plaintiff disputes the finding of suicide and characterizes the Decedent's death as an accident. [AR 43]. Plaintiff hired an expert witness, Kris Sperry, MD, who opined that the Decedent's "act of putting a gun to his head and pulling the trigger was stupid, a mistake, or a combination of both but was not an intentional act to end his life." [AR65]. According to Dr. Sperry, the Decedent's "plans involving meeting with friends in two days, making plans to remodel a portion of the house and purchasing a new car, asking his wife to warm his dinner in the oven, and numerous other details including a new job which he loved, a raise in income, and a wife and daughter who were the loves of his life, - collectively, leads to the conclusion that" the Decedent's death was accidental. [Id.]. Dr. Sperry also criticized Dr. Terry's conclusions *1189 based on her autopsy as "a form of cognitive bias," and declared that Dr. Terry "did not interview anyone, including Felicia Lann." [AR63-64].
Plaintiff also submitted affidavits from Plaintiff, the Decedent's mother, and two friends of the Decedent in further support of Plaintiff's claim that Decedent's death was an accident. In her affidavit, Plaintiff discussed the Decedent's demeanor and conduct on the night of his death, stating "[t]here was nothing in [the Decedent's] demeanor, speech, or attitude on that night that was anything but normal. He was happy. We were making plans to go on vacation. We were making plans to finish, the basement .... He had a conference call with two of his best friends on the way home, and they were making plans to get together on that Friday night. He was in a good mood, and he told me he was hungry and to keep dinner warm until he put his gun away." [AR 95]. Plaintiff stated the Decedent "went through basic training" in the Air Force, but claimed "he did not have any knowledge or experience with firearms." [AR93]. Plaintiff declared that it was "absolutely impossible that [the Decedent] intentionally shot himself," and speculated that "the only rational explanation is that maybe [the Decedent] was about to pose in front of the mirror and this tragic accident was the result of his forgetting or not realizing that he had chambered a bullet or he tripped and fell on his way to putting the gun in the bedroom closet." [AR96].
The Decedent's friends, Tony Robinson and Tyrone Boone, discussed their "conference call" with the Decedent the afternoon of his death, both saying he sounded "normal and happy" and that they made plans to meet in a few days. [AR99; AR102]. Both also declared that they met the Decedent in the Air Force, and he had "no pistol training in the Air Force." [AR98; AR103]. The Decedent's mother, Martha Woodward, stated that the Decedent was "raised in the church," and "had never been around guns growing up and had no experience with them, as far as [she knew]." [AR105-106].
Defendant considered the material submitted by Plaintiff and determined that basic life insurance benefits were payable. [AR12-13]. Defendant paid Plaintiff $ 60,124.05, including $ 56,000 in basic life benefits and $ 4,124.05 in interest. [AR01; AR375]. By letter dated December 23, 2016, Defendant informed Plaintiff that Plaintiff's claims for supplemental life and AD & D benefits were denied because the Decedent committed suicide, within two years of the effective date of coverage. [AR112-113]. Defendant informed Plaintiff of the right to appeal, and emphasized that it would "reconsider the claim" if Plaintiff provided "an amended Death Certificate and Autopsy Report showing the manner of death as an accident." [Id.].
On February 17, 2017, Plaintiff appealed Defendant's determinations, arguing that (1) the death certificate was not "admissible in court," (2) the federal common law presumption against suicide precluded Defendant's benefit denials, and (3) the Decedent's subjective intent to commit suicide was key to determining his cause of death. [AR114-120]. Plaintiff also stated that she attempted to have Dr. Terry amend the death certificate and autopsy report, but Dr. Terry would not consider any "non-scientific" information. [Id.]. Plaintiff further asserts that Dr. Terry's office indicated that an investigation into the state of mind or intent of the deceased is unnecessary when determining whether a death by gun is accident or suicide. [Id.].
Plaintiff provided a second affidavit of Dr. Sperry, who opined that the Decedent's "intent" was necessary to determine the cause of death, and that the "affidavits *1190 of family and close friends" showed "there was no intent" to commit suicide. [AR133]. Also enclosed was a copy of the Medical Examiners' and Coroners' Handbook On Death Registration and Fetal Death Reporting (2003), indicating that a determination of suicide may include an assessment of whether the decedent "intended to kill [him]self or wished to die." [AR116]. Defendant states that this additional material was considered, but determined it was insufficient to overturn its benefit determinations. [AR329].
By letter dated June 22, 2017, Defendant informed Plaintiff that its determinations were upheld, emphasizing that its reliance on the Medical Examiner's determination of suicide was not arbitrary and capricious. [AR332-334]. Plaintiff contends that Defendant failed to consider all of the evidence submitted by Plaintiff indicating that the Decedent's death was an accident and was therefore arbitrary and capricious.
On December 7, 2017, having exhausted her administrative remedies, Plaintiff filed suit pursuant to ERISA §§ 502(a)(1)(B), 502(a)(3) and 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3), seeking payment of the policies. [Doc.1].
B. Applicable Terms of the Plan
Basic life insurance, supplemental life insurance, and AD & D benefits under the Plan were funded by Group Policy No. 158248-01-G ("the Group Policy"), issued by Defendant, MetLife to I.E. [Ex. 1, Affidavit of Pati Casey; Ex. 2, administrative record, AR377-477.] The Plan grants MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." [Ex. 2 at AR474.].
Under the heading "Accidental Death and Dismemberment Insurance," the Plan provides, in pertinent part:
If You or a Dependent sustain an accidental injury that is the Direct and Sole Cause of a Covered Loss described in the SCHEDULE OF BENEFITS, Proof of the accidental injury and Covered Loss must be sent to [MetLife]. When [MetLife] receive[s] such Proof [MetLife] will review the claim and, if [MetLife] approve[s] it, will pay the insurance in effect on the date of the injury.
Direct and Sole Cause means that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes.
[Ex. 2 at AR455]. The Plan makes clear that MetLife "will not pay [AD & D] benefits ... for any loss caused or contributed to by ... suicide or attempted suicide [or] intentionally self-inflicted injury ...." [Id.].
Regarding life insurance benefits, the Plan provides: "When We receive [a] claim form and Proof, We will review the claim and, if We approve it, We will pay benefits subject to the terms and provisions of this certificate and the Group Policy." [AR464]. Under the heading "Suicide," the Plan states:
For Supplemental Life
If You commit suicide within 2 years from the date Life Insurance for You takes effect, [MetLife] will not pay such insurance and [its] liability will be limited as follows:
• any premium paid by You will be returned to the Beneficiary; and *1191 • any premium paid by the Policyholder will be returned to the Policyholder.
[AR467].
"Proof" is defined by the Plan as:
Written evidence satisfactory to [MetLife] that a person has satisfied the conditions and requirements for any benefit described in this certificate. When a claim is made for any benefit described in this certificate, Proof must establish:
• the nature and extent of the loss and condition;
• [MetLife's] obligation to pay the claim; and
• the claimant's right to receive payment.
Proof must be provided at the claimant's expense.
[AR 422].
II. STANDARD OF REVIEW
"When a decision is based on an agreed-upon administrative record, judicial economy favors using findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 rather than summary judgment under Fed.R.Civ.P. 56. Adams v. Hartford Life & Accident Ins. Co. , 694 F.Supp.2d 1342, 1345 n. 1 (M.D.Ga.2010) (citing Doyle v. Liberty Life Assurance Co. of Boston , 542 F.3d 1352, 1363 n. 5 (11th Cir.2008) )." Acree v. Hartford Life and Acc. Ins. Co. , 917 F.Supp.2d 1296, 1304 (M.D.Ga. 2013). In this case, both parties have stipulated to the administrative record. Therefore, pursuant to Rule 52(a), the Court treats these motions as a trial on the record. "In an action tried on the facts without a jury ... the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed.R.Civ.P. 52(a)(1).
ERISA allows an individual who has been denied benefits under an employee benefit plan to bring a lawsuit in federal court challenging the benefits denial. 29 U.S.C. § 1132(a)(1)(B) ; Adams , 694 F.Supp.2d at 1352. In federal court, the burden of proof lies on the claimant to prove entitlement to the plan benefits under ERISA. Horton v. Reliance Standard Life Ins. Co. , 141 F.3d 1038, 1040 (11th Cir.1998) (per curiam). The burden is on the claimant "regardless of whether the claim denial was from the onset of the claimed disability or whether the claim denial was a termination of benefits that had been paid before the denial." Lamb v. Hartford Life and Acc. Ins. Co. , 862 F.Supp.2d 1342, 1349 (M.D.Ga.2012) (quoting Hufford v. Harris Corp. , 322 F.Supp.2d 1345, 1360 (M.D.Fla.2004) (internal quotation omitted) ).
Although ERISA provides a claimant the right to seek redress in federal court, the statutory language does not give a standard for reviewing benefits decisions by plan or claim administrators. Blankenship v. Metropolitan Life Ins. Co. , 644 F.3d 1350, 1354 (11th Cir.2011). In light of ERISA's silence, the Eleventh Circuit has developed a multi-step framework for analyzing ERISA claims and administrators' decisions. The Eleventh Circuit's framework rests on the guidance provided in decisions of the Supreme Court of the United States interpreting ERISA. Id. ; Metropolitan Life Ins. Co. v. Glenn , 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) ; Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The framework is as follows:
(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial is "wrong" (i.e., the *1192 court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
(2) If the administrator's decision is in fact "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
(5) If there is no conflict, then end the inquiry and affirm the decision.
(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.
Blankenship , 644 F.3d at 1355.
In the first step, "[t]he court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." Glazer v. Reliance Standard Life Ins. Co. , 524 F.3d 1241, 1246 (11th Cir. 2008). "In making this determination, the Court does not give any deference to [the administrator's] decision and, instead, stands in the shoes of the administrator and starts from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." Acree v. Hartford Life & Acc. Ins. Co. , 917 F.Supp.2d at 1306 (M.D. Ga. 2013) (citation and internal quotation marks omitted). The Court applies the terms of the plan to determine whether the administrator was "wrong" in denying benefits to the claimant. Brannon v. BellSouth Telecomm., Inc. , 318 Fed.Appx. 767, 769 (11th Cir. 2009). A claim administrator's denial decision was "wrong" if, under a de novo review, the court disagrees with the decision to deny benefits. Glazer , 524 F.3d at 1246.
The Plaintiff's argue that because the evidence was allegedly, at best, inconclusive as to the cause of the Decedent's death, that Defendant's decision to deny benefits under the policies based on either the suicide or intentionally self-inflicted injury exclusion was de novo wrong. [Doc.19 at 27]. In turn, Defendant argues that reliance on the medical examiners opinion and death certificate, as well as consideration of information submitted by Plaintiff, entitled the administrator, in its discretion, to determine that recovery of benefits should be denied. [Doc. 26 at 12]. Based upon a review of the AR, the Court agrees with the Defendant and finds that the Defendant's decision to deny supplemental life and AD & D benefits under the Plan was not de novo wrong.
Numerous courts have held that claim administrators can properly rely on an insured's death certificate and autopsy report in evaluating claims for death benefits. See McCorkle v. Metropolitan Life Ins. Co. , 757 F.3d 452, 455 (upholding benefits denial based on a death certificate identifying the cause of death as "suicide"); Hancock v. Metro. Life Ins. Co. , 590 F.3d 1141, 1156 (10th Cir. 2009) (upholding benefits denial based on a death certificate finding "undetermined causes" of death); Malin v. Metro. Life Ins. Co. , 845 F.Supp.2d 606, 614 (D. Del. 2012) (defendant was "permitted to consider the Assistant Medical Examiner's opinion of [the decedent's] manner of death, along with the rest of the administrative record"); The *1193 Wellinger Family Trust 1998 v. Hartford Life and Accident Ins. Co. , 2013 WL5339160, *10 (D. Colo. September 24, 2013) (upholding benefits denial based on death certificate identifying "suicide" as the cause of death); McClurg v. Hartford Life and Accident Ins. Co. , 2006 WL 2801878, *5 (M.D. Fla. Sept. 28, 2006) (upholding benefits denial based in part on the decedent's death certificate, an autopsy report, and a forensic toxicology laboratory report).
Moreover, because such documents are prepared by independent government employees pursuant to statutory duties, with no interest in the outcome of a subsequent claim for insurance benefits, courts find them to be particularly persuasive. See Hancock , 590 F.3d at 1156 ("[w]e think it significant that MetLife relied on the government's investigations and conclusions to deny Ms. Hancock's claim. Such reliance reduces potential bias arising from MetLife's conflict of interest and shows that its [determination] was grounded on a reasonable basis"); Sorrells v. Sun Life Assur. Co. of Can. , 85 F.Supp.2d 1221, 1233 n. 20 (S.D. Ala. 2000) ("Defendant, who played no role in the decision to administer the test or the actual test administration, or the analysis of the test results, was entitled to rely on the official state department test in the absence of any evidence that the results are inaccurate or somehow comprised, and the court finds nothing arbitrary and capricious on such reliance"). Courts also emphasize that a plaintiff who "feels that the Medical Examiner's investigation led to an incorrect conclusion," can apply to amend it. Malin , 845 F.Supp.2d at 614. See Ga. Comp. R. & Regs. 511-1-3-.26. In fact, Defendant offered to reconsider its benefit denial(s) if Plaintiff provided an amended death certificate and autopsy report showing the manner of death as "accident," but according to Plaintiff's attorney the Medical Examiner declined to amend them based on "non-scientific" evidence.
Although Plaintiff submitted, and Defendant considered, opinions from Dr. Sperry and affidavits from the Decedent's family and friends as subjective, circumstantial evidence of the Decedent's alleged lack of intent to commit suicide, Defendant nevertheless was entitled to rely on the objective conclusions of the Gwinnett County Medical Examiner based on her autopsy that the Decedent committed suicide. Prelutsky v. Greater Georgia Life Ins. Co. , 692 F. App'x 969, 974 (11th Cir. 2017) (an "administrator is permitted to rely on medical evidence over a conflicting witness account," and "is entitled to choose an apparently more reliable source of information when sources conflict") (quoting Brown v. Blue Cross & Blue Shield of Ala. , 898 F.2d 1556, 1572 (11th Cir. 1990) ); McCorkle , 757 F.3d at 454-55 (upholding benefit denial where the insured "placed the handgun ... under his chin, aimed it in an upward direction, and pulled the trigger," and the death certificate's cause of death was "suicide," notwithstanding speculation that Lunesta may have "caused his behavior"); Hancock , 590 F.3d at 1156 ("circumstantial evidence indicate[d] that accidental death [was] a possibility," but the "autopsy failed to find sufficient evidence to establish any cause of death"); Eliskalns v. Provident Life and Accident Ins. Co. , 230 F.3d 1366 (9th Cir. 2000) ("while there is evidence in the record that would support a finding of accident, there is also substantial evidence supporting a finding of suicide"); Wellinger , 2013 WL 5339160 at *10 ("the lack of a suicide note might suggest a cause of death other than suicide, [but] that conclusion would be supported here only by speculation, not empirical evidence").
Furthermore, it simply was not wrong, or arbitrary and capricious, for Defendant *1194 to evaluate the evidence and exercise its discretionary authority to credit Dr. Terry's medical conclusions over the opinions of Dr. Sperry. See Doyle , 542 F.3d at 1363 ("[t]he evidence shows that Doyle had substantial medical problems. Some of the experts opined that she could not perform the material duties of her 'Own Occupation.' Other experts opined that objective medical evidence did not substantiate her claims and that she could perform the material duties of her 'Own Occupation.' Liberty Life is vested with discretion to determine eligibility under ChoicePoint's plan; thus we owe deference to its determination. Because the evidence is close, we cannot say, even accounting for the conflict, that Liberty Life abused its discretion in denying Doyle benefits")
Thus, after a review of the Administrative Record, the Court finds that the Defendant's decision to deny Supplemental Life and AD & D benefits to Plaintiff based upon the evidence that the Decedent committed suicide was de novo correct. Defendant's Motion for Judgment on the Administrative Record must be Granted and Plaintiff's Motion for Summary Judgment must be Denied.
Notwithstanding the Court's decision that Defendant's decision was not de novo wrong, if the Court had determined otherwise, the Court must move to the second step in the analysis and ask whether Defendant had been given discretionary authority under the Plan. Blankenship , 644 F.3d at 1355. Here, the Plan explicitly states that the "Proof is defined by the Plan as: Written evidence satisfactory to [MetLife] that a person has satisfied the conditions and requirements for any benefit described in this certificate. When a claim is made for any benefit described in this certificate, Proof must establish:• the nature and extent of the loss and condition; • [MetLife's] obligation to pay the claim; and • the claimant's right to receive payment." [AR422]. Plaintiff concedes that Defendant had the discretionary authority to interpret the Plan and make benefit decisions. Because Defendant was vested with discretionary authority, the Court must proceed to step three and ask whether the decision to terminate benefits was reasonable.
Even if Defendant's decision to deny benefits was de novo wrong, it was certainly not arbitrary or capricious, for there was a reasonable basis for denying Plaintiff's claim. At step three of the analytical framework, the Court must apply an arbitrary and capricious standard and determine whether Defendant's decision to deny benefits was "reasonable." Blankenship , 644 F.3d at 1355. The Court asks only if there is a "reasonable basis" to support the claim administrator's decision to deny benefits. Jett v. Blue Cross & Blue Shield of Ala., Inc. , 890 F.2d 1137, 1140 (11th Cir.1989). If reasonable grounds exist, then the Court must defer to the claim administrator and uphold the decision "even if there is evidence that would support a contrary decision." Blankenship , 644 F.3d at 1355-56 (quoting White v. Coca-Cola Co. , 542 F.3d 848, 856 (11th Cir.2008) (internal citations and quotation marks omitted) ). The Court's review "need not be particularly complex or technical; it need only assure that the administrator's [benefits determination] fall[s] somewhere on a continuum of reasonableness - even if on the low end." McCorkle , 757 F.3d at 457. "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Perry v. United Food & Comm. Workers Dist. Unions , 64 F.3d 238, 241 (6th Cir. 1995). Thus, "even if there is evidence that would support a contrary [determination]," Jett v. Blue Cross & Blue Shield of Ala., *1195 Inc. , 890 F.2d 1137, 1140 (11th Cir. 1989), the Court must accord deference to the administrator's determination if reasonable. See Townsend v. Delta Family-Care Disability and Survivorship Plan , 295 F. App'x. 971, 976 (11th Cir. 2008), ("[s]o long as it was supported by evidence in the administrative record, the Committee's decision to deny ... benefits was not improper; it is irrelevant whether this court or anyone else might have reached a different conclusion").
For all of the reasons discussed above, Defendant's benefit determinations were reasonable and should be upheld. Defendant's reliance on the opinions of Dr. Terry, the death certificate, and the autopsy report was not arbitrary and capricious, and Defendant did not abuse its discretion in evaluating the evidence in the administrative record. McCorkle , 757 F.3d at 460 ; Hancock , 590 F.3d at 1156 ; Eliskalns , 230 F.3d at 1366 ; Malin , 845 F.Supp.2d at 614.
Finally, it is appropriate to briefly address Plaintiff's contention that Defendant operated under a structural conflict of interest at the time of the Administrative appeal as per steps four and five. Blankenship , 644 F.3d at 1355. An administrator that both determines eligibility for benefits and pays out benefits has a conflict of interest. Id. (citing Glenn , 554 U.S. at 112, 128 S.Ct. 2343 ). Even where a conflict of interest exists, however, the plaintiff has the burden of proving how the conflict rendered the denial decision arbitrary, for the conflict must have "inherent or case-specific importance." Id. (quoting Doyle v. Liberty Life Assur. Co. of Boston , 542 F.3d 1352, 1360 (11th Cir.2008) and Glenn , 554 U.S. at 117, 128 S.Ct. 2343 ) (internal quotation marks omitted) ). If there is a conflict of interest, the Court will only consider this as one factor in its arbitrary and capricious review. Id. In the case at hand, Plaintiff has failed to provide proof that the conflict contributed in any way to the decision to deny benefits. Pointing to a "generalized economic incentive," without more, does not create a conflict of interest. Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey , 663 F.3d 1124, 1133 (10th Cir.2011) (citing Finley v. Hewlett-Packard Co. Empl. Benefits Org. Income Prot. Plan , 379 F.3d 1168, 1176 (10th Cir.2004) ). Finding no conflict, the Court need not reach the sixth step of the review.
III. CONCLUSION
For the forgoing reason, the Court GRANTS Defendant's Motion for Judgment on the Administrative Record [Doc. 21] and Plaintiff's Motion for Summary Judgment [Doc. 19] is hereby DENIED.
IT IS SO ORDERED, this 19th day of February, 2019.